## BEAMSLEY v. COMMISSIONER OF INTERNAL REVENUE.

No. 10794.

United States Court of Appeals
Seventh Circuit.

July 31, 1953.

Spaulding Glass and Theodore R. Scott, Chicago, Ill., for petitioner.

H. Brian Holland, Asst. Atty. Gen., Hilbert P. Zarky, Sp. Asst. to the Atty. Gen., Ellis N. Slack, A. F. Prescott, Alonzo W. Watson, Sp. Assts. to the Atty. Gen., for respondent.

Before MAJOR, Chief Judge, FINNEGAN, Circuit Judge, and BRIGGLE, District Judge.

MAJOR, Chief Judge.

This petition is to review a decision of the Tax Court, entered September 17, 1952, sustaining respondent's determination of deficiencies in petitioner's income tax for the years 1945 and 1946, in the amounts of $11,449.68 and $8,599.09, respectively. 18 T.C. 988. The findings and opinion are those of the judge who tried the case and were not reviewed by the court.

The contested issue, as stated by petitioner and we think correctly, is whether the evidence of record supports the Tax Court's conclusions that the payments made to Mrs. Beamsley (wife of petitioner), pursuant to paragraph 7 of a contract executed September 11, 1939, were to compensate petitioner, Foster G. Beamsley, for his influence or assistance, real or supposed, in assuring the continuance of National City Lines (sometimes referred to as N.C.L.) as a client of Transportation Underwriters Agency (sometimes referred to as Underwriters), and are, for that reason, taxable to petitioner as ordinary income.

As the issue thus stated indicates, the controversy revolves in the main around the effect to be given paragraph 7 of such contract. There are other provisions, however, which are referred to and discussed, and it appears appropriate in the inception to set forth the material provisions of the contract. They are as follows:

"This Memorandum Of Agreement, made and entered into this 11th day of September, A. D. 1939, by and between Foster G. Beamsley, Inez L. Beamsley, Martha Jane Beamsley, R. H. Johnson and Claire M. Johnson, all of the City of Chicago, County of Cook and State of Illinois, and Transportation Underwriters Agency, Inc., an Illinois corporation with its principal office in Chicago, Illinois,

"Witnesseth:

"Whereas, Foster G. Beamsley is Vice-President and Director of Transportation Underwriters Agency, Inc., Inez L. Beamsley is a Director of said Company, and Inez L. Beamsley and Martha Jane Beamsley are the owners of one-half of the common and preferred stock of said Company; and

"Whereas, it is the desire of Foster G. Beamsley and Inez L. Beamsley to retire from the business of insurance brokerage and to sever their several connections with Transportation Underwriters Agency, Inc.; and

"Whereas, Transportation Underwriters Agency, Inc. is desirous of purchasing its stock so owned by Inez L. Beamsley and Martha Jane Beamsley,

"Now, therefore, in consideration of the mutual covenants and agreements hereinafter contained, It Is Mutually Covenanted And Agreed By And Between The Parties Hereto As Follows:

"1. Foster G. Beamsley agrees to resign as officer and Director of Transportation Underwriters Agency, Inc. as of January 1, 1939.

"2. Transportation Underwriters Agency, Inc. agrees to pay to Foster G. Beamsley in cash, on or before December 31, 1939, the unpaid balance of his salary for the year 1938.

"3. Inez L. Beamsley agrees to assign, transfer and set over to Transportation Underwriters Agency, Inc. 400 shares of its common capital stock and 38¾ shares of its preferred stock.

"4. Martha Jane Beamsley agrees to assign, transfer and set over to Transportation Underwriters Agency, Inc. 400 shares of its common capital stock and 38¾ shares of its preferred stock.

"5. Transportation Underwriters Agency, Inc. agrees to transfer, assign and set over to Inez L. Beamsley 544¾ shares of the common capital stock of National City Lines, Inc., a Delaware corporation, and to pay to her the sum of $2,091.88 and to assign, transfer and set over to Inez L. Beamsley $5,357.93 of the amount due to it from Foster G. Beamsley on account of insurance premiums previously paid by it for him.

"6. Transportation Underwriters Agency, Inc. agrees to assign, transfer and set over to Martha Jane Beamsley 544¾ shares of the common capital stock of National City Lines, Inc., a Delaware corporation, and to pay to her the sum of $2,091.88 and to assign, transfer and set over to Martha Jane Beamsley $5,357.93 of the amount due to it from Foster G. Beamsley on account of insurance premiums previously paid by it for him.

"7. Transportation Underwriters Agency, Inc. agrees to pay to Inez L. Beamsley for and during the joint lives of Foster G. Beamsley and R. H. Johnson, or for a period of five years from July 1, 1939, whichever is the longer, an amount equal to one-half of the gross commissions earned and retained by it on account of insurance policies written for National City Lines, Inc., its officers, employes, subsidiaries and affiliates, their officers and employes (except any person, not now an officer or employe of National City Lines, Inc. or an officer or employe of a subsidiary or affiliate of National City Lines, Inc., who is a regular customer of Transportation Underwriters Agency, Inc. at the time he becomes such officer or employe) or any corporation with which it may merge or consolidate or which may succeed to its business (other than corporations which are customers of Transportation Underwriters Agency, Inc. prior to the time of such merger, consolidation or succession * * *

* * * * * *

"9. Foster G. Beamsley and Inez L. Beamsley jointly and severally covenant and agree that they will not become insurance brokers, agents or solicitors as defined by the statutes of the State of Illinois now in force, nor will they become financially interested in any corporation or partnership which is such broker, agent or solicitor, so long as the payments provided for by paragraph 7 herein are made to Inez L. Beamsley. * * * "

The contract contains twelve paragraphs, and we omit a portion of paragraph 7 and all of paragraphs 8, 10, 11 and 12 as being presently irrelevant. The contract was signed for Transportation Underwriters Agency, Inc., by R. H. Johnson, President, and by Foster G. Beamsley (petitioner), R. H. Johnson (individually), Inez L. Beamsley (wife of petitioner), Martha Jane Beamsley (a daughter of Foster G. and Inez L. Beamsley), and Claire M. Johnson (wife of R. H. Johnson). The transfers and payments made to Inez L. Beamsley (hereinafter referred to as Mrs. Beamsley) or the transfers and payments made to Martha Jane, by reason of paragraphs 5 and 6, are not involved. Pursuant to paragraph 7, payments were made annually to Mrs. Beamsley from 1940 to 1946, inclusive. The minimum amount paid her was $8,413.28, for the year 1940. During the years here involved, there was paid her $20,526.49 for the year 1945, and $11,169.45 for the year 1946.

It is petitioner's contention that the payments thus made represented a part of the consideration received for the sale of her stock in Underwriters and were therefore capital gain to her. It is respondent's contention that such payments were not received by Mrs. Beamsley as part consideration for the sale of her stock but that they were ordinary income (not that of Mrs. Beamsley but of her husband, petitioner), as consideration for his influence or assistance, real or supposed, in assuring the continuance of N.C.L. as a client of Underwriters. It is on this premise that the payments for 1945 and 1946 have been charged to petitioner; hence the deficiencies in controversy. The sole question for our consideration is whether the record furnishes any reasonable or substantial basis for the findings upon which the conclusion of the Tax Court is predicated. In approaching this question, we of course are not unmindful of our limited scope of review, or of the finality which ordinarily must be accorded the findings of the Tax Court.

That court in much detail, as well as respondent in his brief here, finds and discusses the business relations and connections of the persons involved for a period commencing as early as 1927, down to 1939, when the contract in controversy was executed. Much of this has to do with the connection of the parties with previous companies and corporations while they resided in Minnesota, and prior to their business connections in Chicago. As we view the situation, most of this material is irrelevant. It is mere background, or perhaps it can be more aptly characterized as window-dressing.

The crucial findings, if they can be thus designated, are: "During the negotiations

[preliminary to the contract of September 11, 1939], Beamsley knew that Johnson felt that he (Beamsley) 'had a lot of influence' with Fitzgerald in placing the insurance business of National's [N.C.L.] system, but Beamsley at no time did or said anything to Johnson to contradict Johnson's understanding in this respect," and "The payments thus provided for in paragraph 7 were not made in order to obtain Mrs. Beamsley's stock; they were agreed to and made for Mr. Beamsley's real or supposed influence in having National continue to place the insurance business of its system with Underwriters."

A brief statement of additional undisputed facts should perhaps be made. Underwriters was incorporated under the laws of Illinois on May 14, 1931. From the beginning, all the outstanding shares of common stock, except a few qualifying shares owned by the directors (including Johnson and Beamsley), were owned by Mrs. Beamsley and Mrs. Johnson, each with 800 shares. Later, there were issued 155 shares of preferred stock, of which Mrs. Beamsley and Mrs. Johnson each acquired 77½ shares. On September 9, 1939 (two days prior to the execution of the contract), Mrs. Beamsley transferred to her daughter, Martha Jane, one-half of her shares of common stock (or 400 shares) and one-half of her shares of preferred stock (or 38¾ shares). Such was the situation as to stock ownership in Underwriters on September 11, 1939, when the contract was executed.

Underwriters was an insurance broker and primarily engaged in the insurance business. This part of the business was under the management of Johnson, who was a licensed insurance broker. Other features of its business, such as investments, speculations and development of oil property in Texas and elsewhere, were under the supervision of Beamsley. N.C.L. was a corporation organized in March 1936. It was a holding company and controlled a large number of subsidiaries which operated bus lines over an area of about fifteen states. Its president was E. Roy Fitzgerald who, with his brothers, dominated N.C.L.'s operations. Beamsley was a director, stockholder and vice president in charge

of its financial affairs, arranging loans and handling transactions with banks. N.C.L. was an important customer of Underwriters for insurance required in connection with the bus operations of its subsidiaries. Beamsley, Fitzgerald and Johnson were all friends and intimates as far back as 1927, when they were all doing business of one kind or another in Minnesota.

It should be kept in mind that the Tax Court does not find, and it is not urged that Beamsley actually exercised any influence upon Fitzgerald in the placing of N.C.L.'s insurance. It is only asserted that Beamsley was in a position to do so or that Johnson at the time of the execution of the contract thought that Beamsley had such influence. The Tax Court found: "Although Beamsley was not in a position to direct the placing of the insurance of National's system, he was in a position, in 1939 and years prior and subsequent thereto, to exercise some influence over Fitzgerald's choice in placing such insurance, and over Fitzgerald's choice thereafter in permitting the insurance to remain with the same broker." At the same time, it found that Fitzgerald "would not have permitted the business to be placed with Underwriters if its rates had compared unfavorably with the rates obtainable elsewhere."

While it perhaps has little bearing, we think it is of some pertinency to note the position which the parties have taken at various times regarding the payments received by Mrs. Beamsley under paragraph 7 of the contract. Mrs. Beamsley, commencing in 1940, for each year to and including 1945, in her income tax returns reported such payments as ordinary income and paid a tax accordingly. So far as the record discloses, no question was raised by the Commissioner during these years. On March 4, 1947, Mrs. Beamsley filed a claim for refund with respondent on the premise that the $20,526.49 received by her from Underwriters in 1945, pursuant to the contract of September 11, 1939, and reported as ordinary income, should have been reported and taxed as a capital gain upon the sale of her Underwriters stock.

She also filed a similar claim covering the years 1943 and 1944. Pursuant to such claims, respondent allowed refunds for each of the years 1943, 1944 and 1945, in the total amount of $15,988.52. In 1946, Mrs. Beamsley reported the sum of $11,169.45, the payment she received under the contract for that year, as additional capital gain on the 1939 sale of her Underwriters stock. In 1949, the Commissioner reversed his position. On March 8 of that year, respondent sent a deficiency notice to both petitioner and Mrs. Beamsley, in which he treated the payments received by Mrs. Beamsley during the years in question as ordinary income, taxable both to the petitioner and Mrs. Beamsley. In these statements it was said that the payments were being taxed to both parties respectively, "pending a final determination as to whom it is properly taxable and as to whether it is ordinary income or capital gain." The respondent in his notice to petitioner, referring to paragraph 7 of the contract, stated: "It was under this latter provision that the above mentioned amount was paid to Mrs. Beamsley in 1945. This insurance business of the National City Lines was placed by you with the Transportation Underwriters Agency prior to the date of the contract in 1939, when you had control (which was retained by you until some time in 1946) of the placing of such business."

It will be noted that the Commissioner's action at that time rested upon the premise that petitioner had control of placing the N.C.L. insurance in 1939, which control continued until sometime in 1946. The premise thus stated was not embraced by the Tax Court and apparently has been abandoned by respondent. The latter now states in his brief: "Though it seems clear, as set out above, that the taxpayer could influence the payments this was not essential. * * * it is sufficient that Johnson *thought* taxpayer had such influence and agreed to make the payments to retain his influence."

Respondent now advances the alternative and inconsistent theory that the consideration for the payments agreed to be made to Mrs. Beamsley under paragraph 7 is the covenant by petitioner and Mrs. Beamsley contained in paragraph 9, not to engage in the insurance business so long as the payments provided for by paragraph 7 were being made to Mrs. Beamsley. This theory evidently stems from a statement contained in the minutes of a meeting of the board of directors of Underwriters held on September 11, 1939, as follows:

"The Chairman [R. H. Johnson] stated that F. G. Beamsley, Inez L. Beamsley and Martha Jane Beamsley had offered to enter into an agreement with the company and its President [R. H. Johnson] and Claire M. Johnson, providing for the sale to the company of all the stock held by the Beamsley family in exchange for cash and certain securities and providing that F. G. Beamsley and Inez L. Beamsley shall not act as insurance brokers during the joint lives of F. G. Beamsley and R. H. Johnson, or for a period of five years from July 1, 1939, whichever is longer, in return for certain monthly payments to be measured by the amount of gross commissions earned and retained on account of business of National City Lines, Inc. A copy of the proposed agreement was presented to the directors and examined by them."

We think there is not a vestige of merit in this theory. According to the minutes, three directors were present at this meeting, including Johnson but not petitioner. The minutes disclose that J. M. Schramm, one of the directors present, did not vote, and in the instant proceeding he testified that the reason he refused to vote was that the statement made by Johnson did not correctly represent the contract which had been proposed. The contract itself plainly shows that the covenant contained in paragraph 9 was no part of the consideration for the payments promised Mrs. Beamsley in paragraph 7. (Subsequently we shall show the reason why paragraph 9 was inserted.)

The record is permeated with the prejudicial intimation, without direct accusation, that Mrs. Beamsley was not the actual bona fide owner of the stock which she sold. It is conceded—in fact, it was stipu-

lated—that she "held title," but respondent refused to agree that she was the bona fide owner. In our view, she must be so treated for the purpose of the present litigation. The point was not decided by the Tax Court; in fact, it was not put in issue. Moreover, respondent is in a poor position to make such an unfavorable implication because, from 1939 to the trial of this case, he recognized Mrs. Beamsley as the actual bona fide owner. Otherwise, the amounts paid under paragraph 7 were not properly chargeable to her either as ordinary income or as capital gain. In 1940, Martha Jane filed a return showing dividends which she had received on the stock transferred to her by Mrs. Beamsley two days before the execution of the contract in controversy. Respondent, however, asserted a deficiency against Mrs. Beamsley which was paid by her on the theory that she and not the daughter was the owner of the stock. It is too late now to intimate that some person other than Mrs. Beamsley was the actual owner of the stock, and it is immaterial whether she acquired it by gift or whether it was transferred to her, as asserted by petitioner, in payment or in part payment of an obligation which he owed her.

Petitioner offered two witnesses other than himself who testified as to the facts and circumstances surrounding the execution of the contract of September 11, 1939, as well as the relation which existed among petitioner, Johnson and Fitzgerald. No witnesses were offered by respondent. Petitioner complains bitterly, not without merit, that the Tax Court ignored the oral testimony and based its position upon untenable inferences.

As we have already shown, it appears that the theory that Beamsley could control Fitzgerald in placing his insurance business with Underwriters has been abandoned. If not, the theory is thoroughly demolished by the testimony of three witnesses. The case is finally made to rest upon the untenable premise that Johnson (now deceased) thought that Beamsley had influence with Fitzgerald in retaining the latter's insurance for Underwriters. In other words, Beamsley sold Johnson, a man thoroughly experienced in the insurance field and all of its ramifications, a gold brick, sold him something which it is now conceded Beamsley did not possess. Admittedly, the reason for the contract of September 11, 1939, was a rift which had arisen between Johnson and Beamsley. The former openly accused the latter of not earning the salary which was being paid him by Underwriters which, in the period 1936 through 1938, averaged $8,000 per year. So, under respondent's theory, Johnson, with his long experience in the insurance business and with complete knowledge of the value of the business being received by Underwriters from N.C.L., conceived a plan by which he would pay Mrs. Beamsley for the influence possessed by Beamsley, which cost Underwriters for the first three years some $15,000 per year. In other words, Johnson having concluded that Beamsley's influence as an officer of Underwriters was not worth $8,000 per year, must also have concluded that his influence as an outsider was worth $15,000 per year. We think this is a fantastic theory, "As thin as the homoeopathic soup that was made by boiling the shadow of a pigeon that had been starved to death" (a quotation credited to Abraham Lincoln).

A detailed narration and discussion of the oral testimony offered by petitioner would unduly prolong this opinion. We shall, therefore, confine our discussion in the main to the testimony of Greydon L. Walker, a practicing lawyer in 1939 and, since 1943, secretary of N.C.L. Walker wrote the contract of September 11, 1939. He was an intermediary between Johnson and Beamsley, who were hardly on speaking terms. His testimony makes it plain that the contract finally consummated represented a compromise between the demands of Johnson and those of Beamsley, and that the payments provided for Mrs. Beamsley under paragraph 7 were part of the consideration for the purchase by Johnson of Mrs. Beamsley's stock, and recognized by both Johnson and Beamsley as such, the other consideration being provided in paragraphs 5 and 6. Walker also explained the reason for the insertion of

paragraph 9 by stating that the parties had agreed upon all the terms when Johnson suggested the insertion of that paragraph. Walker took it up with Beamsley and his wife, who stated they did not object because they had no intention of going into the insurance business. In place of accepting this plain and plausible explanation, respondent would have us infer, as we have shown, that the covenant was inserted as consideration for the payments under paragraph 7.

Respondent makes the point that Martha Jane owned the same number of shares of stock as her mother (Mrs. Beamsley) and that if the payments provided for in paragraph 7 had been made for the stock, such payments would have been divided between Martha Jane and Mrs. Beamsley. Again, the reason this was not done is shown by the testimony of Walker. Martha Jane had acquired this stock by gift only two days previously, and when Walker suggested to Mrs. Beamsley that half the payments provided for in paragraph 7 be paid to Martha Jane, Mrs. Beamsley stated, "Oh, no; I don't want her to have that much money. I just want her to have what I figure out is so many thousand dollars that I want to give her." And Walker stated, " * * * consequently, I drafted the contract as it was drafted at Inez' request." We see no basis for an inference that the payments provided by paragraph 7 represented income of petitioner because they were made entirely to Mrs. Beamsley rather than one-half to her and the other half to Martha Jane.

Respondent also claims to find support for his theory in the fact that the payments made to Mrs. Beamsley under paragraph 7 were limited to a portion of the commissions earned by Underwriters on N.C.L. business. In other words, such payments did not include commissions earned by Underwriters on the business of the Greyhound Bus Lines, which was also an important customer of Underwriters. We must admit we discern nothing in this situation of aid to respondent. After all, the contract represented a compromise by the parties, attained after considerable negotiation. Beamsley had urged that the payments to Mrs. Beamsley be based upon the commissions on all of Underwriters' insurance business. Johnson would not agree, and the limitation finally decided upon was a compromise. Again the testimony of Walker shows why Johnson would not agree to Beamsley's request in this respect. It was because Wichman, the president of Greyhound Bus Lines, had served notice on Johnson that his company would withdraw its insurance business from Underwriters if any part of the commissions on its business were paid to Mrs. Beamsley.

Considerable is said about the fact that Mrs. Beamsley did not attend the stockholders' meetings of Underwriters, that she took no part in its management, and that she knew nothing about the insurance business. We see nothing unnatural about her position in this respect. She gave her husband a proxy to represent her at stockholders' meetings and undoubtedly, as might be expected, depended upon him to manage and care for her interest in the corporation. And certainly no unfavorable inference can be drawn from the fact that he made the best possible deal with Johnson, both on his own account and on that of Mrs. Beamsley. It is a strange idea that because a husband, by his best efforts, makes as good a bargain as possible in the sale of stock owned by his wife, he is not acting on her behalf and she is not entitled to the fruits of his efforts. The Tax Court in its opinion, referring to the payments to be made under paragraph 7, states, "Beamsley could have arranged to have those monies paid to himself. Instead, he arranged to have them paid to his wife." This reasoning begs the entire question. We suppose that the payments, if made for Beamsley's supposed influence, could have been paid to him; on the other hand, if they were a part of the consideration for the sale of Mrs. Beamsley's stock, he had no right to provide in the contract that they be made to any person other than Mrs. Beamsley, without her consent.

An excuse given for ignoring the testimony of Walker and other witnesses offered by petitioner is that they were officers of N.C.L. What difference that makes we do not know. N.C.L. had no financial

interest in the contract between Underwriters and the Beamsleys. It was as free thereafter to withdraw its business from Underwriters as it was before. A study of the record furnishes no reason why the testimony of these witnesses should be cast aside and the case decided upon speculation and conjecture.

In our opinion, and we so decide, the payments made to Mrs. Beamsley under paragraph 7 of the contract were a part of the consideration for the purchase by Underwriters of the stock owned by her. The decision of the Tax Court to the contrary is clearly erroneous. The petition for review is allowed and the decision of the Tax Court is reversed, with directions that the deficiencies, if any, in petitioner's tax for the years 1945 and 1946 be redetermined in accordance with this opinion.