Nos. 97-557 and 98-011

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 8

297 Mont. 493

995 P.2d 923

IN THE MATTER OF MORTON B.

GOLDSTEIN, at Attorney at Law,

and

IN THE MATTER OF SCOTT A.

ALBERS, an Attorney at Law,

Petitioners,

v.

THE COMMISSION ON PRACTICE OF

THE SUPREME COURT OF THE STATE

OF MONTANA,

Respondent.

ORIGINAL PROCEEDING

COUNSEL OF RECORD:

**For Petitioners:**

Robert J. Emmons (argued), Attorney at Law, Great Falls, Montana

(Albers); Andrew J. Utick (argued) , Attorney at Law, Helena,

Montana (Goldstein)

**For Respondent:**

Sam E. Haddon (argued) , Chair, Commission on Practice,

Missoula, Montana; Keith Strong (argued) , Attorney at Law,

Great Falls, Montana

**For Amici Curiae:**

Martha Sheehy (argued) , Attorney at Law, Billings, Montana

(State Bar of Montana); Charles F. Moses (argued), Attorney at Law,

Billings, Montana; Wade J. Dahood (argued), Attorney at Law,

Anaconda, Montana; Melody K. Brown (argued), Attorney at Law,

Ammon, Idaho; Frank B. Morrison, Jr., Whitefish, Montana;

L. Sanford Selvey, II, Billings, Montana; Patricia O'Brien Cotter,

Great Falls, Montana

Heard: October 26, 1999

Submitted: November 23, 1999

Decided: January 13, 2000

Filed:

_____

Clerk

2

Chief Justice J. A. Turnage delivered the Opinion of the Court.

¶1.These matters are before the Court following the filing of formal complaints against Morton B. Goldstein and Scott A. Albers before the Commission on Practice, and the Commission's subsequent filings of findings, conclusions, and recommendations for discipline of those attorneys with this Court. The cases were consolidated for oral argument on common issues concerning the constitutionality of the structure and function of the Commission on Practice.

¶2.In this Opinion, we address only those issues of general import to attorney disciplinary proceedings which were orally argued before the Court. We do not here discuss the Commission's findings, conclusions, and recommendations as to the particulars of the Goldstein or Albers case. The issues which have been raised as to those matters, and the Court's final determination as to the appropriate discipline, if any, of Goldstein and Albers, will be discussed in separate Orders or Opinions to be issued at a later date.

¶3.The constitutional issues discussed herein are:

¶(1). Does Rule 9 of the Rules on Lawyer Disciplinary Enforcement deny the respondent attorneys due process of law, the right to an impartial tribunal, and equal protection under the law?

¶(2). Were Goldstein and Albers denied their constitutional rights by virtue of the confidentiality provisions of Rule 13 of the Rules on Lawyer Disciplinary Enforcement?

Background on the Rules on Lawyer Disciplinary Enforcement

¶4.This Court adopted the Rules on Lawyer Disciplinary Enforcement which are currently in effect in 1983, replacing substantially similar rules which had been in effect since 1965 and had been adopted pursuant to the Court's authority under the 1889 Montana Constitution. The 1983 Rules were promulgated pursuant to the Court's rule-making authority under Article VII, Section 2(3) of the Montana Constitution:

a.[The Supreme Court] may make rules governing . . . admission to the bar and the

conduct of its members.

The Court which adopted the Rules now in effect did not include any of the Court's present members.

¶5.The Rules provide that the Court shall appoint an eleven-member commission known as the Commission on Practice of the Supreme Court of the State of Montana. Eight members of the Commission are lawyers appointed from eight designated areas of the State. Those appointees are selected from lists from each area of the three attorneys who received the highest number of votes in an election by the area resident members of the State Bar of Montana. The Court also appoints three nonlawyer members to the Commission. The members of the Commission elect from its lawyer members a chairperson, a vice chairperson, and a secretary.

¶6.Under the Rules, the Commission performs the initial consideration of complaints against attorneys for violation of the canons of professional ethics or rules of professional conduct adopted by this Court. The Commission is empowered, *inter alia*, to adopt rules or policies providing for procedural rules not in conflict with the Rules adopted by this Court, to administer admonitions and private censures, and to conduct formal disciplinary proceedings as provided in the Rules. The Commission also possesses authority to appoint investigators to investigate complaints and report to the Commission.

¶7.The procedure followed in handling a complaint against a Montana attorney under the Rules and the additional procedures adopted by the Commission is, in general, as follows: Upon receipt of a complaint against a Montana attorney, the Commission sends a copy of the complaint to the attorney against whom the complaint is made. The attorney is given time to submit a written reply to the complaint. The complainant is then given the opportunity to point out any factual errors in the reply. Thereafter, the full Commission meets to conduct a preliminary consideration of the complaint. If it appears that the facts do not warrant disciplinary action, the Commission dismisses the matter and so notifies the complainant and the attorney involved.

¶8.If, on the other hand, the complaint is not dismissed, the Commission may refer the matter either to a grievance committee or to an investigator. Because grievance committee proceedings are not at issue here, we shall not discuss them further.

¶9.The Rules on Lawyer Disciplinary Enforcement authorize the Commission to appoint

as investigators either lawyers or nonlawyers. Investigators generally serve in a volunteer, or *pro bono*, capacity. The Commission has adopted a procedure in which four lawyers located in different parts of the State, who are themselves appointed by the president of the State Bar of Montana, assist the Commission in recruiting investigators. Each of these four lawyers appointed by the president of the State Bar is charged with recruiting lawyers to serve as investigators for disciplinary matters in a given area of the State. When the Commission has determined that an investigator should be appointed, it notifies one of the four lawyers, who then secures an investigator for that particular complaint.

¶10. Upon completion of an investigation, the investigator submits a written report to the Commission. The Commission then determines what type of disciplinary action, if any, to pursue. The Commission may vote to administer a private admonition to the attorney. In such cases, the matter is then deemed terminated.

¶11. If the Commission instead determines that formal disciplinary proceedings should be initiated against the attorney, it appoints special counsel to prepare and file a formal complaint setting forth the nature of the alleged misconduct. The investigating attorney may or may not be the attorney who is appointed as special counsel. The complaint subsequently drafted by special counsel is filed with the Commission and with the Clerk of the Montana Supreme Court, and is served with a citation upon the attorney against whom the complaint is filed. Under the present Rules on Lawyer Disciplinary Enforcement, only at this point do the proceedings against the attorney become public.

¶12. The attorney against whom the formal complaint is filed is granted twenty days to prepare, file, and serve a written response to the formal complaint. Then, the Commission must give at least twenty days' notice of the date, time, and place set for a hearing on the complaint. Discovery may be undertaken at this time.

¶13. At the hearing on the complaint, the attorney is entitled to be represented by a lawyer, to cross-examine witnesses, and to present evidence. Special counsel presents the case that disciplinary action is justified. The hearing is recorded and is conducted, in general, in accordance with the practice and the trial of civil actions. The full Commission sits as the finder of fact.

¶14. Following the hearing, the Commission submits to the Court a transcript of the hearing and a report in which it sets forth its findings, conclusions, and recommendations. The attorney is served with the Commission's report and is allowed time to file written

objections thereto; special counsel is then allowed time to file a brief in opposition to the objections.

¶15. At that time, the disciplinary proceeding is considered submitted to the Court, which, under the Preamble to the Rules, retains "original and exclusive jurisdiction and responsibility . . . in all matters involving admission of persons to practice law in the State of Montana, and the conduct and disciplining of such persons." The Court may set the matter for oral argument and may hold additional hearings. Thereafter, the Court may dismiss the complaint or impose such discipline as it deems appropriate, including private censure, public censure, or suspension or disbarment of the attorney from the practice of law in Montana.

Issue 1

¶16. Does Rule 9 of the Rules on Lawyer Disciplinary Enforcement deny the respondent attorney due process of law, the right to an impartial tribunal, and equal protection under the law?

¶17. Rule 9 of the Rules on Lawyer Disciplinary Enforcement sets forth the procedure followed by the Commission on Practice, as outlined above. Goldstein and Albers assert that this procedure violates their rights to due process, to an impartial tribunal, and to equal protection in that it improperly vests both investigatory and adjudicatory functions in one body-the Commission on Practice. The bulk of Goldstein's and Albers' arguments, and thus the bulk of our discussion, relate to whether Rule 9 violates the constitutional right to due process of law.

¶18. This Court considered a similar challenge to Montana's lawyer discipline system in *Matter of Wyse* (1984), 212 Mont. 339, 688 P.2d 758. In that case, attorney Wyse argued that because the Commission on Practice acted as prosecutor, judge, and jury in proceedings before it, he was deprived of due process.

¶19. This Court disagreed. The Court explained that "the proceedings before the Commission on Practice are designed to establish a record upon which this Court must act." *Wyse*, 212 Mont. at 346, 688 P.2d at 762. The Court pointed out that it retains exclusive jurisdiction in all matters involving public censure, disbarment, or suspension. It further pointed out that under the rules, the respondent attorney was given full rights of representation by counsel, confrontation of witnesses, the adducement of evidence in his

own behalf, and the right to fully argue the merits on the facts and the law. Finally, the Court pointed out that Wyse had not identified any prejudice resulting to him from a purported denial of due process, except that he disagreed with the findings and conclusions of the Commission. The Court found no deprivation of due process. *Wyse*, 212 Mont. at 346, 688 P.2d at 762.

¶20. Although the *Wyse* case was prosecuted under rules of disciplinary enforcement which have since been superseded, the Rules on Lawyer Disciplinary Enforcement currently in effect had been adopted by the time this Court heard that case. In connection therewith, the Court specifically noted that the due process protections which it identified under the rules which controlled in *Wyse* continue to be provided under the then-newly-adopted Rules on Lawyer Disciplinary Enforcement. *Wyse*, 212 Mont. at 346, 688 P.2d at 762.

¶21. Goldstein and Albers cite a 1993 study by the American Bar Association Standing Committee on Professional Discipline which suggested that in order to avoid presenting an appearance of unfairness, full-time disciplinary counsel should be appointed in Montana. The ABA committee also suggested that the Commission should be divided into separate panels for reviewing and hearing proceedings in each case before it. However, the ABA committee made no determination, and had no authority to do so, as to the constitutionality or lack thereof of the present system of lawyer discipline in Montana. We are not convinced that Montana's lawyer discipline system is unconstitutional merely because it may be possible to improve the system.

¶22. Our position is supported by an Opinion of the United States Supreme Court. In *Withrow v. Larkin* (1975), 421 U.S. 35, 43 L.Ed.2d 712, 95 S.Ct. 1456, the Court upheld the constitutionality of an administrative disciplinary system for Wisconsin physicians which combined investigatory and adjudicatory functions. The Court noted that bias in a decision maker is not presumed and must be proven, and that "the case law, both federal and state, generally rejects the idea that the combination (of) judging (and) investigating functions is a denial of due process." *Withrow*, 421 U.S. at 47 and 51 (citation omitted).

¶23. The *Withrow* Court termed "untenable" the argument that bias automatically arises from a combination of investigatory and adjudicatory functions. *Withrow*, 421 U.S. at 55. The court reasoned:

Judges repeatedly issue arrest warrants on the basis that there is probable cause to believe that a crime has been committed and that the person named in the warrant has committed

it. Judges also preside at preliminary hearings where they must decide whether the evidence is sufficient to hold a defendant for trial. Neither of these pretrial involvements has been thought to raise any constitutional barrier against the judge's presiding over the criminal trial and, if the trial is without a jury, against making the necessary determination of guilt or innocence. Nor has it been thought that a judge is disqualified from presiding over injunction proceedings because he has initially assessed the facts in issuing or denying a temporary restraining order or a preliminary injunction. It is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law. We should also remember that it is not contrary to due process to allow judges and administrators who have had their initial decisions reversed on appeal to confront and decide the same questions a second time around.

*Withrow*, 421 U.S. at 56-57.

¶24. The procedure for Montana attorney discipline is more protective of the licensee than the one found constitutional in *Withrow* in that the entity which allegedly improperly combines functions in the Montana lawyer discipline system, the Commission, makes only recommendations for discipline. In *Withrow*, the entity which combined prosecutorial and adjudicatory functions also had the authority to suspend the physician's license. *Withrow*, 421 U.S. at 37. As noted in *Wyse*, and as clearly provided under the Rules on Lawyer Disciplinary Enforcement, this Court has taken upon itself the sole responsibility to adjudicate lawyer ethical violations.

¶25. The *Withrow* Court held, however, that the special facts and circumstances of a case in which investigatory and adjudicatory functions were combined may justify a conclusion that the risk of unfairness from the combination of functions is intolerably high in that particular case. *Withrow*, 421 U.S. at 58. Although Goldstein and Albers raise this specter, they have made no allegations of specific facts and circumstances which would overcome the presumption of honesty and justify a conclusion that, in either of these cases, the risk of unfairness from the combination of functions is intolerably high or that they have been denied their rights to impartial tribunals.

¶26. Goldstein, Albers, and some amici maintain that attorneys should be accorded the same procedural protections as are other licensed professionals in the State of Montana,

whose professional discipline proceedings are governed by the Uniform Professional Licensing and Regulation Procedures set forth at Title 37, Chapter 1, part 3, MCA. This is the apparent centerpiece of their equal protection argument.

¶27. Goldstein and Albers point out that under the Uniform Professional Licensing and Regulation Procedures, the persons who sit on a screening panel to determine whether there is reasonable cause to believe that disciplinary procedures are justified must not thereafter participate in the final decision in the case. *See* § 37-1-307(1)(e), MCA. Goldstein and Albers cite that as a due process protection. The Commission responds that the present lawyer discipline system in which a majority of the full 11-member Commission, including both lawyers and nonlawyers of various backgrounds, must agree that a formal complaint against an attorney is justified provides more protection to the respondent attorney than would a system in which a 3-member subcommittee was allowed to make that critical determination. We agree.

¶28. There are other ways in which the Rules on Lawyer Disciplinary Enforcement may offer the licensee more protections than do the Uniform Professional Licensing and Regulation Procedures. For example, the Montana Administrative Procedure Act, under which adjudicative proceedings in licensing matters are held, *see* § 37-1-310, MCA, allows the agency to select the hearing examiner to conduct the disciplinary hearing. *See* § 2-4-611(1) and (2), MCA. The findings of that agency-selected hearing examiner are difficult to overturn. *See* § 2-4-621(3), MCA ("the agency . . . may not reject or modify the findings of fact unless the agency first determines from a review of the complete record and states with particularity in the order that the findings of fact were not based upon competent substantial evidence or that the proceedings on which the findings were based did not comply with essential requirements of law") and § 2-4-704, MCA (regarding judicial standards of review of agency decisions). In contrast, this Court exercises *de novo* review over the findings of the Commission on Practice.

¶29. We agree that attorneys confronted with proceedings which may result in the loss of their licenses to practice their profession are entitled to due process, as are other professionals faced with such proceedings. Goldstein and Albers have cited no authority, however, stating that either equal protection or due process requires that identical procedures must be followed in all types of professional disciplinary proceedings. The United States Supreme Court has indicated to the contrary, noting in *Withrow* that "the incredible variety of administrative mechanisms in this country will not yield to any single organizing principle." *Withrow*, 421 U.S. at 52.

¶30.We conclude that neither Goldstein nor Albers has established that the procedure for handling disciplinary complaints as set forth under Rule 9 of the Rules on Lawyer Disciplinary Enforcement denies a respondent attorney due process of law, the right to an impartial tribunal, or equal protection under the law.

## Issue 2

¶31.Were Goldstein and Albers denied their constitutional rights by virtue of the confidentiality provisions of Rule 13 of the Rules on Lawyer Disciplinary Enforcement?

¶32.Rule 13 of the Rules on Lawyer Disciplinary Enforcement provides:

A. Confidentiality. All disciplinary proceedings which are prior in time to the filing of a formal complaint with the Clerk of the Supreme Court and all documents in connection therewith shall be confidential.

B. Public Proceedings. Upon the filing of a formal complaint with the Clerk of the Supreme Court in a disciplinary matter, or upon the filing with the Clerk of the Supreme Court of a petition for reinstatement, the proceedings before the Commission shall be public except for:

(1) deliberations of the Commission;

(2) information or proceedings with respect to which the Commission or Supreme Court has issued a protective order.

C. Violation. Violation by any person of any confidential information under these rules shall be punishable as a contempt of the Supreme Court.

D. Duty of Participants. All participants in a proceeding under these rules shall conduct themselves so as to maintain the confidentiality mandated by this rule.

¶33.Goldstein and Albers complain that pursuant to Rule 13, they were denied access to documents which had been filed with the Commission prior to the filing of the formal complaints against them, and that they were excluded from Commission deliberations on their cases. Albers also complains that he was not allowed to depose the chairman or members of the Commission on Practice, the investigator of the informal complaint

against him, or the special prosecutor of the formal complaint against him.

¶34.Goldstein and Albers argue that Rule 13 violates their rights to free speech under Article II, Section 7 of the Montana Constitution because the Rule places a "blanket gag order on all freedom of expression relating to ethical charges against an attorney." In so arguing, Goldstein cites *Doe v. Supreme Court of Florida* (S.D. Fla. 1990), 734 F.Supp. 981.

¶35.The plaintiff in *Doe* had filed a complaint with the Florida Bar against his former attorney. The Florida Bar determined that the complaint was meritorious and that the attorney in question had indeed violated the Code of Professional Responsibility. A private reprimand was issued against the lawyer. The plaintiff subsequently wished to speak and publish articles about his complaint. He dared not do so, however, out of fear of being punished for violation of a disciplinary rule which provided for confidentiality of disciplinary proceedings. He filed suit asking that the rule be declared unconstitutional. The United States District Court for the Southern District of Florida entered summary judgment for the plaintiff, declaring that the disciplinary rule was unconstitutional on its face and as applied. *Doe*, 734 F.Supp. at 988.

¶36.*Doe* is clearly distinguishable from the cases before us. First, and contrary to Goldstein's assertions, Montana's Rule 13 is not "identical" to the confidentiality provision at issue in *Doe*. Under Rule 13, after the Commission determines that a complaint is meritorious and directs the filing of a formal complaint, the proceedings are public. Such was apparently not the case after the Florida Bar determined that plaintiff Doe's complaint was meritorious. Second, the facts and circumstances listed above which Goldstein and Albers cite in support of their argument that they were deprived of their rights to free speech under the confidentiality rule are totally different from the facts and circumstances which served as the basis for the court's "unconstitutional as applied" decision in *Doe*. After considering Goldstein's and Albers' free speech claims, we hold that they have not established that their rights to free speech were violated.

¶37.We next consider the contention that Goldstein and Albers were denied their right to due process of law through application of Rule 13. Again, this claim relates to Goldstein's and Alber's alleged inability to prepare for their cases before the Commission as a result of being prohibited from reviewing documents in the Commission's files which were filed prior to the filing of the formal complaints against them.

¶38.Due process requires notice and an opportunity to be heard. *Goldberg v. Kelly* (1970), 397 U.S. 254, 25 L.Ed.2d 287, 90 S.Ct. 1011. Our review of the Court's files in the Goldstein and Albers matters establishes that the formal complaints filed against Goldstein and Albers were detailed, thorough, and public. Goldstein and Albers cannot deny that well before their public hearings before the Commission they were fully informed in detail of each charge against them and the legal basis for each.

¶39.Discovery in the Albers case included special counsel's disclosure of the names of persons with relevant knowledge, and the names of the witnesses the special counsel intended to call. In fact, prior to his public hearing before the Commission, Albers deposed all three principal witnesses who testified against him. In Goldstein's case, special counsel provided to Goldstein's counsel the names and addresses of all witnesses special counsel intended to call at the hearing; a list of all exhibits special counsel intended to offer, and an opportunity for Goldstein to copy all such exhibits. Neither Goldstein nor Albers claims that he was surprised by any of the evidence presented against him at the formal hearing before the Commission or that he consequently did not have a chance to meet that evidence.

¶40.Goldstein and Albers argue, however, that they were deprived of due process in that they were not allowed to examine documents filed with the Commission prior to the filing of the formal complaints. In considering this aspect, we first note that any evidence relating to portions of an informal complaint not included in the formal charges filed against an attorney is not relevant, much less important, to the respondent attorney's preparation to meet the charges at the formal hearing. Because the informal stage of the proceedings is not part of the record normally considered by the Court, any evidence which comes to light during the informal investigation but does not relate to matters included in the formal complaint does not enter into the ultimate outcome. The formal complaint controls the issues to be decided at the hearing before the Commission and the ultimate outcome of the disciplinary proceedings before this Court.

¶41.More troubling is the concern that evidence which may be exculpatory to the respondent attorneys as to issues which were included in the formal complaints may exist in the Commission's pre-formal-complaint files. We agree that any exculpatory evidence which was filed before the formal complaint and which relates to matters eventually included in the formal complaint must be disclosed to the respondent attorney.

¶42.The Court has obtained from the Commission and examined the Commission's files

and records in the Goldstein and Albers cases prior to the dates of filing of the formal complaints. We have found no such exculpatory evidence. We conclude that neither Goldstein nor Albers has demonstrated violation of his right to due process by virtue of Rule 13.

¶43. Albers argues that Rule 13 denies him his right to equal protection under the law, making a comparison with the constitutional provision and statutes concerning the Judicial Standards Commission under which a judge responding to a disciplinary complaint may waive confidentiality. *See* Art. VII, § 11(4), Mont. Const., and § 3-1-1122, MCA. Beyond a bare accusation of denial of equal protection, Albers' argument is inscrutable, and we will not consider it further. Albers has not established that he was treated differently under the Rules on Lawyer Disciplinary Enforcement from any other attorney facing disciplinary charges.

¶44. In his objections to the Commission's findings, conclusion, and recommendation, Albers also asserts that Rule 13 violates his right to full legal redress. He makes this argument only in general and cursory form, and he did not address the issue at oral argument. We find no merit in this argument.

¶45. In his briefs, Albers further asserts that the Rule 13 provision on confidentiality of Commission proceedings violates his right to know under Article II, Section 9, of Montana's Constitution in that deliberations and all records of public bodies must be open. Albers asserts that confidential Commission proceedings also violate his right to participate in government decisions under Article II, Section 8. In addition, Albers argues that Article VII, Section 2(3) of the Montana Constitution does not specifically allow any proceedings of the Commission on Practice to be confidential.

¶46. According to these arguments an amount of consideration commensurate with their skeletal presentation by Albers, we reject them. First, Albers has failed to establish that the deliberations of the Commission, as an arm of this Court, and unlike the deliberations of this Court or of juries, are subject to the open meeting requirements set forth in Montana's Constitution. *See* Order In re Selection of a Fifth Member to the Montana Districting Apportionment Commission, August 3, 1999.

¶47. It is also plain that because the Commission sits only in an advisory capacity to the Court, no prejudice has been shown, or can be shown, to Goldstein and Albers as a result of their exclusion from the Commission's deliberation meetings. Goldstein, Albers, and

some amici have suggested that the Commission might somehow be swayed by confidential information outside the record. We again point out that this Court reviews the record in an attorney discipline matter *de novo* to determine whether the charges have been proven by clear and convincing evidence. Goldstein, Albers, and their supporting amici have offered no speculation about how confidential information provided to the Commission prior to the filing of a formal complaint could sway the opinion of this Court, whose review is limited to the record of the formal proceedings against the attorney. In short, there has been a complete failure to show how any confidential information outside the record, with the exception of exculpatory evidence filed with the Commission prior to the filing of the formal complaints, could have any actual prejudicial effect on the results.

¶48.Goldstein and Albers were granted full discovery of all evidence to be presented at the formal hearings against them. Moreover, the final decision maker, this Court, ordinarily has no access to any material not found in the record filed with the Clerk of this Court. Our review leads us to conclude that Goldstein and Albers have not established that Rule 13 confidentiality prior to the filing of a formal complaint, the confidentiality of Commission deliberations after the filing of the formal complaint, or the denial of some of Albers' discovery requests interfered with their due process or other constitutional rights.

## Conclusion

¶49.We hold that Goldstein and Albers have not established violation of their constitutional rights by application of either Rule 9 or Rule 13 of the Rules on Lawyer Disciplinary Enforcement. We take under further advisement the remaining issues raised in these matters as to the discipline to be imposed, if any, against Morton B. Goldstein and Scott A. Albers.

/S/ J. A. TURNAGE

We concur:

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

/S/ KARLA M. GRAY

Justice James C. Nelson dissenting.

¶50.I dissent from the Court's decision that Rules 9 and 13 of the Rules for Lawyer Disciplinary Enforcement (hereafter, simply referred to as Rules or Rule) do not deny a respondent attorney due process of law. I conclude and would hold that the rules fail in this regard and, accordingly, are violative of Montana's Constitution, Article II, Section 17. I also conclude and would hold that Rule 13 is unconstitutional as violative of Montana's Constitution, Article II, Section 9.

## *Introduction*

¶51.Before commencing my discussion of the law, I want to make one thing unequivocally clear. My dissent should not be read as a criticism of the members of the Commission on Practice (COP), either past or present, or of any of the attorney investigators and special counsel who, with no compensation and little thanks, have and continue to unselfishly give of their time and talent to the cause of lawyer discipline in Montana. Quite simply, without the generous, voluntary contributions of these respected and dedicated members of the State Bar of Montana (Bar), the whole discipline system would collapse; we would not have what little we have now.

¶52.And that is part of the problem. As this dissent suggests, this Court has imposed too great a burden for lawyer discipline on the few members of the Bar willing to serve. The Bar has argued for reform; respected members of the Bar (one, a delegate to the Constitutional Convention) as *amici curiae* have argued for reform; the respondent attorneys in these cases and attorneys in other cases pending before the COP have argued for reform, yet we have ignored their pleas. Lawyer discipline in Montana is constitutionally deficient, not because of anything the COP or the Bar have done or have failed to do but, rather, because this Court, in the exercise of its constitutional authority under Article VII, Section 2(3), has mandated the use of an unconstitutional scheme for disciplining attorneys.

¶53.Whether to avoid what would, no doubt, be a politically unpopular Court-mandated Bar dues increase to fund needed reforms, or out of fear of having to rehear the instant cases and jeopardizing the numerous other disciplinary proceedings pending before the COP[1] we have refused to acknowledge and to rectify the glaring constitutional deficiencies in Montana's disciplinary scheme that are patently obvious to nearly every organization and attorney who has appeared in these proceedings.

¶54.Indeed, I am dumb-founded by our decision. In 1996, after years of studying the current disciplinary system and after suggesting changes to rectify the obvious constitutional and practical infirmities it identified, the leadership of the Bar went "on the road" to promote to the membership a modest dues increase to fund some of the hereinafter discussed needed improvements to this State's lawyer disciplinary system. In support of that effort various members of the COP and this Court, this writer included, joined the band-wagon to pointedly argue to Montana's attorneys the urgent need and legal necessity for these changes. Now, a mere three-plus years later--at a time when the COP continues to struggle with its heavy case load of lawyer disciplinary proceedings and at a time when the law supporting the mandate for these changes has been forcefully and eloquently argued by the respondent attorneys, by the Bar and by numerous other *amici curiae*--this Court's support has evaporated. Go figure.

¶55.That we have failed to discharge our singular administrative responsibility to reform the system for lawyer discipline in this State is bad enough; that we have failed in our most solemn obligation as judges to support, protect and defend the constitutional rights of a whole profession--the very profession, ironically, that is sworn to defend the due process rights of every other citizen--is unforgivable.

¶56.Montana is the Last Best Place for many things. In terms of a constitutionally sufficient lawyer disciplinary system, however, Montana is simply last!

## *Discussion*

## *I. Rule 9*

### *A. The American Bar Association Report*

¶57.In 1992, this Court invited the American Bar Association (ABA) to consult on Montana's lawyer regulatory system. An experienced and highly credentialed team from the ABA conducted interviews with persons involved with all facets of the regulatory system, including members of this Court, the Board of Governors (now Board of Trustees) and Executive Director of the Bar, Members of the COP, volunteer investigators and special counsel, respondents' counsel, respondents, complainants, members of the client protection committee, members of the lawyer assistance program and members of the Bar generally. The team also reviewed internal office records and procedures of the COP and the client protection committee as well as the rules governing lawyer discipline, client

protection and lawyer assistance. The team also received written comments from persons that it was unable to interview. *Report on the Montana Lawyer Regulation System*, at 2 (Nov. 1993) (hereafter *ABA Report*).

¶58.As a result of this study, the ABA issued an insightful and comprehensive report in November 1993. This report--the *ABA Report*--analyzed, discussed and made recommendations on all phases of Montana's regulatory system for lawyers including the need for creation of an office of disciplinary counsel, restructuring of the COP, reforming lawyer disciplinary procedures, sanctions, access to the disciplinary system, protection mechanisms (lawyer trust accounts), and other lawyer and client security matters not at issue here. The *ABA Report* is worth reading. It graphically points up the deficiencies in Montana's lawyer regulation and disciplinary system and, of particular relevance to the matters under discussion, the *ABA Report* is severely critical of Montana's procedures under Rule 9.

¶59.Not surprisingly, the majority gives the *ABA Report* short shrift. However, portions of this study serve to focus the due process infirmities inherent in Montana's disciplinary system which this Court has chosen to ignore. With apologies to the reader for the lengthy block quote, those parts of the *ABA Report,* because of their relevance and importance, are set out here:

## I. CREATION OF THE OFFICE OF DISCIPLINARY COUNSEL

### Recommendation 1: Appointment of Disciplinary Counsel

**The Supreme Court should establish an Office of Disciplinary Counsel and appoint an attorney to serve as Disciplinary Counsel. The Disciplinary Counsel should have the duty to receive, screen, investigate and prosecute complaints of attorney misconduct in Montana. Disciplinary Counsel should have the authority to hire staff necessary to perform his or her duties and not rely on the use of volunteer investigators and prosecutors.**

### Recommendation 2: Staff in the Office of Disciplinary Counsel

**Disciplinary Counsel should share one full-time assistant counsel, 2 full-time secretaries and part-time non-lawyer investigators as needed on a contract basis.**

## The Montana System

Montana is the only jurisdiction in the United States that has no professional staff employed in the investigation and prosecution of complaints against attorneys. The Commission on Practice handles a complaint at every stage in the process until final adjudication by the Montana Supreme Court. Volunteer investigators and special counsel from different geographical areas are called upon to investigate and prosecute cases.

## Effects on the Montana System

Having the same group perform oversight and review functions at each stage in the process as well as conduct hearings and make findings, conclusions, and recommendations to the Supreme Court creates an appearance of unfairness, although no improprieties were found. It is difficult for any person to review complaints initially to determine whether they should be investigated, review them again after investigation to determine whether formal charges should be filed and then sit as an impartial adjudicator.

The use of volunteers to investigate and prosecute causes delay and inconsistency. Volunteers lack expertise in disciplinary enforcement. They are often not aware of the nuances of the rules of professional conduct or of all the procedural rules applicable in a particular situation, such as interim suspension or subpoena power, or are unsure how to apply these rules. The team learned there is also some resistance on the part of the volunteers to performing the investigative and prosecutorial function because of the time it takes away from their own practice and their lack of expertise. There was agreement among those interviewed by the team that the use of volunteer investigators and prosecutors is the weakest link in the lawyer disciplinary system. Many noted that investigators are not promptly appointed and that, once appointed, they do not promptly complete the investigation and report to the Commission. Often an attorney will agree to investigate a matter and then advise the Commission several months later that he or she is too busy to handle the matter. The Commission must then find another investigator.

The delay that results is harmful to the profession. As one Commission member stated, "To have a hearing on a serious matter one or two years after the complaint was filed is unfair to the complainant and the attorney involved. Justice is not served."

## The Recommendation

The team recommends that the Supreme Court appoint a full-time disciplinary counsel to screen, investigate and prosecute disciplinary complaints. The Supreme Court is already responsible for appointing the member of the Commission on Practice. The team believes that the disciplinary system should be controlled and managed exclusively by the Montana Supreme Court and agrees that the disciplinary system should continue to be separate from the state bar. In Recommendation 19, several suggestions are made regarding programs that can properly be managed by the state bar.

The team heard no complaint about any individuals who serve on the Commission on Practice. The recommendation to appoint full-time disciplinary counsel is in no way a relation on the quality of service or the dedication of those individuals. Rather, the team believes that this structural change is needed because the capacity of the current system has been reached and will soon be exceeded. The system is overly dependent on too few people. Several Commission members noted that the amount of time it takes to handle Commission business, including meetings, phone calls from complainants and respondents, and review of files and hearings, is becoming prohibitive, especially for small or solo practitioners. The appointment of professional disciplinary counsel would reduce the workload for the Commission members making it possible for all types of persons to serve on it.

Several Commission members expressed concern that if a professional disciplinary counsel were appointed, the Commission would be totally removed from the preliminary decision-making process and that this would hamper the Commission's ability to function as an agency of the Court. The team believes that the Commission on Practice should continue to be involved in the decision to file formal charges and suggests in recommendation 7 that the Commission divide into panels of three to review the recommendation of the disciplinary counsel after investigation.

*ABA Report, at 9-11.*

## III. DISCIPLINARY PROCEDURES

**Disciplinary counsel should screen complaints and conduct an investigation when the facts alleged, if true, would constitute a violation of the Montana Rules of Professional Conduct.**

**Recommendation 7: Review Panels**

**The Commission on Practice should be divided into three person panels to review the recommendations of disciplinary counsel after investigation and decide whether to dismiss, issue a cautionary letter or private reprimand, or direct that formal charges be filed.**

## The Montana System

Currently all cases are referred to the full Commission for review after a complaint has been filed and the respondent has answered the complaint. No screening occurs. The files are given to individual Commission members for review. Each Commission member reports at the next meeting on the files he or she reviewed. The Commission reviews approximately 100-120 cases at each meeting with each member reporting on approximately 10 cases. The Commission determines whether to dismiss the matter, issue a cautionary letter or a private reprimand, or assign the matter to a volunteer investigator. After the report from the volunteer investigator has been received, the Commission determines whether formal charges should be filed.

*ABA Report, at 19.*

## Recommendation 9: Hearings

**Hearings should be conducted by the nine Commission on Practice members who did not serve on the review panel that determined probable cause existed to file formal charges in the matter.**

## The Montana System

All members of the Commission sit as the hearing body after having reviewed all matters at the investigation and probable cause stages.

## Effects on the Montana System

As discussed in Recommendation 1, the current system creates an appearance of unfairness.

## The Recommendation

The Commission on Practice has argued that the current system of its involvement at each stage is appropriate because its role is to remain informed about and involved in all phases of the disciplinary process, acting as the "eyes and ears" of the Supreme Court in order to make appropriate recommendations to the Court, which remains ultimately responsible for lawyer discipline in the state. The team believes, however, that the separation of the prosecutorial and adjudicative functions is essential to maintaining a system that is and appears to be fair and one in which the public and the bar can have confidence. If the Court were to delegate additional authority to the Commission to impose some types of public discipline, which Commission members agreed is possible as the volume of complaints increases, the separation of prosecutorial and adjudicative functions will be required.

In order to keep the investigative and adjudicative functions separate, the members who sit on the review panel of a case should not participate on the hearing panel for that case. Thus, the team recommends that the nine Commission members who did not participate in the probable cause determination sit as the hearing body in the case.

An alternative utilized in a number of states would be for the Commission on Practice, composed of twelve members, to be divided into four panels comprised of two lawyers and one non-lawyer. After review by one panel of the Commission, a case would go to another three member panel for hearing. This approach separates investigative and adjudicative functions of the Commission and makes scheduling of the hearing dependent on a smaller number of people.

*ABA Report, at 23-24.*

## B. The Majority Opinion

¶60. The foregoing analysis and recommendations offered by the *ABA Report* could not be more germane to the controversy at bar.

¶61. As this Court's opinion points out, Goldstein and Albers primarily assert that the procedures employed under Rule 9 by the COP violate their due process rights on the grounds that they "improperly vest both investigatory and adjudicatory functions in one body," and therefore deny their right to an impartial tribunal. As one of the *amici* suggests, despite the Commission's best efforts in this matter, its members "came into the hearing room with their minds made up."

¶62.A fair and impartial tribunal is a basic guarantee of due process under both the United States and the Montana Constitution. *See, e.g., State v. Moore* (1994) 268 Mont. 20, 51, 885 P.2d 457, 477. Critical to any review of the Rules here is the principle that due process violations may be adjudged not only on the basis of actual harm--the lack of which the majority ultimately relies on for its decision--but also on the basis of the appearance or risk that potential harm or prejudice may occur due to an inherent flaw in the process itself. *See Mayberry v. Pennsylvania* (1971), 400 U.S. 455, 469, 91 S.Ct. 499, 507, 27 L.Ed.2d 532 (Harlan, J., concurring) (stating that "the appearance of even-handed justice . . . is at the core of due process"). As previously stated, the failure of due process in Montana's attorney disciplinary scheme does not lie with the COP or with the attorney investigators and special counsel, but, rather with the structural lack of due process afforded by the Rules themselves. Thus, the majority's "no harm, no foul" approach does not solve the problem nor is this tack consistent with the standards of due process which we have articulated for tribunals in non-lawyer discipline cases. As we have stated, "any tribunal permitted by law to try cases and controversies not only must be unbiased *but also must avoid even the appearance of bias*." *May v. First Nat. Pawn Brokers, Ltd.* (1994), 269 Mont. 19, 24, 887 P.2d 185, 188 (quoting *Commonwealth Coatings Corp. v. Continental Casualty Co.* (1968), 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (emphasis added).

¶63.In support of the respondents' position, several *amici* have persuasively argued that without sufficient "walls of division" between the investigative/prosecutorial and judicial functions of the COP, the actual threat or appearance of bias will persist under the current attorney disciplinary rules. *See generally Lyness, M.D. v. State Board of Medicine* (Pa. 1992), 605 A.2d 1204, 1209-10 (holding that a physician's due process rights were violated by commingling of prosecutorial and adjudicatory functions within single multi-administrative board). Consequently, until such changes as those suggested in the *ABA Report* are implemented, the unfairness inherent in our own "commingling of prosecutorial and adjudicatory functions" in the COP, as presently structured, will never be corrected. The appearance of bias will continue to exist and with that appearance the failure of due process.

¶64.The respondents and *amici* also persuasively argue that Montana lawyers are not afforded the same measure of due process protection as are other professionals in Montana. The majority also summarily rejects this argument, concluding that Montana lawyers enjoy "more"protection in disciplinary proceedings than other professionals (a determination that I will address later). I agree with the respondents and *amici*.

¶65. Montana's Administrative Procedure Act, §§ 2-4-101 through 711, MCA, and the statutes governing professional licensing, §§ 37-1-101 through 413, MCA, provide due process "walls of division" in the investigative, prosecutorial and adjudicative phases of the discipline process for other professions that are lacking in Montana's attorney disciplinary system. Thus, other professionals in Montana are afforded a hearing examiner or "judge" assigned on the basis of his or her "expertise required for the particular matter," under § 2-4-611(1), MCA, or an independent hearing examiner selected from the attorney general's office or from another agency, under § 2-4-611(2), MCA. Other professionals have the right to move for disqualification of the examiner due to bias or lack of independence, under § 2-4-611(4), MCA. Other professionals are guaranteed that final decisions of a disciplinary board will be made by persons who did not serve on the "reasonable cause" screening panel, and that the preliminary investigators will not be permitted to participate in the subsequent hearing of a case, under § 37-1-307(1)(e), MCA.

¶66. These sorts of "walls of division" are an essential component of due process and are the centerpiece of the *ABA Report's* recommendations. Unfortunately, this concept is also summarily dismissed by the majority. Even the low-impact suggestion of dividing the COP into panels comprised of two lawyers and one non-lawyer, so as to separate the investigative functions of one panel from the adjudicative functions of a different panel is rejected.

¶67. Rather, in concluding that the procedures set forth under Rule 9, do not impermissibly combine functions, the majority relies on this Court's decision in *Wyse*--a 15-year old case which was decided under a completely different disciplinary scheme, i.e., the 1965 disciplinary rules.[2] According to the majority, the due process issues raised here, under the current 1983 rules, were presumptively addressed and resolved by our decision in *Wyse*. Our opinion states at ¶ 22 that: "the Court [in *Wyse*] specifically noted that the due process protections which it identified under the rules which controlled in *Wyse* continue to be provided under the then newly-adopted Rules on Lawyer Disciplinary Enforcement."

¶68. I do not disagree that in *Wyse* the issue of whether the COP serving as "prosecutor, judge and jury" deprives an attorney of due process was raised by the respondent, just as it has been raised here. *Wyse*, 212 Mont. at 345, 688 P.2d at 761. The problem with the majority's reliance on *Wyse* is that once the separation of functions issue was clearly set out in that case, we disposed of it without actually addressing its merits.

¶69. We stated that "[u]nder *both sets of rules*, and particularly under the rules applicable

to Wyse [the 1965 rules], the proceedings before the COP are designed to establish a record upon which this Court must act." *Wyse*, 212 Mont. at 346, 688 P.2d at 762 (emphasis added). We continued our due process analysis by determining that the respondent attorney also had been afforded: 1) full right of representation by counsel, 2) confrontation of witnesses, 3) the adducement of evidence in his own behalf, and 4) the right to argue the merits on the facts and law. *Wyse*, 212 Mont. at 346, 688 P.2d at 762. We then concluded:

Rather than depriving lawyers of due process, our rules provide for an orderly method of preserving to the attorney accused before the Commission, and later before us, his denials and defenses to the charges made against him in the widest latitude. We find no deprivation of due process affecting Wyse's rights in this cause.

*Wyse, 212 Mont. at 346, 688 P.2d at 762.*

¶70.None of the foregoing due process rights which we discussed, however, even remotely implicated Wyse's right to an impartial tribunal and the separation of investigative, prosecutorial and adjudicative functions under the 1965--much less under the 1983 rules, where such "walls of division" do not exist. Even assuming that the elements of procedural due process addressed in *Wyse* apply to the current rules, the specific due process issue raised by Goldstein and Albers--whether the disciplinary rules deny their right to an impartial tribunal--has never been addressed by this Court, and *Wyse* cannot be relied on for that proposition, the majority's conclusion to the contrary notwithstanding.

¶71.Moreover, a review of related decisions by this Court reveals that *Wyse*, in fact, followed a trend of ducking procedural due process analysis--a trend which the majority here seems willing to blindly follow. For example, in a rather lengthy and detailed decision issued prior to *Wyse*, this Court skirted the opportunity to render a comprehensive analysis of procedural due process as applied to the disciplinary rules. We stated: "[a]ll due process requires . . . is the attorney be given a fair hearing before the Commission. He has received this." *Matter of Goldman* (1978), 179 Mont. 526, 551, 588 P.2d 964, 978 (addressing the due process right to cross examine witnesses against the attorney). We then only peripherally addressed the issue of whether it was "improper for the chairman of the Commission on Practice to act as both the person in charge of the hearing, and as the trier of the facts." We concluded that no prejudice occurred. *Goldman*, 179 Mont. at 552, 588 P.2d at 978. However, we reached this conclusion without any comprehensive review of procedural due process under either a federal or state law. *See also In re Porter* (1970),

156 Mont. 190, 190-91, 478 P.2d 866, 866-67 (addressing without reference to due process whether it was "unfair" for the Commission to first secure counsel to present the results of its investigation and then "sit in judgment on its merit").

¶72.Simply put, neither *Wyse* nor any other Montana case has substantively addressed and properly resolved the separation of functions/impartial tribunal/due process issues raised by Goldstein and Albers in the instant proceeding. The majority's reliance on *Wyse* for the contrary conclusion is, as Abraham Lincoln is reported to have observed, "as thin as the homeopathic soup that was made by boiling the shadow of a pigeon that had been starved to death." *See Beamsley v. Commissioner of Internal Revenue* (7th Cir. 1953), 205 F.2d 743, 748.

¶73.Even more disturbing is the majority's reliance on the U.S. Supreme Court's decision in *Withrow v. Larkin* (1975), 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712. For nearly 20 years, *Withrow* has been argued for the tenuous principle that combining investigatory functions with adjudicative functions does not, "without more," deny due process in attorney disciplinary proceedings. *See*, *e.g.*, *In re Davis* (Ariz. 1981), 628 P.2d 38, 40 (citing *Withrow* and concluding that it was not "unfair" for an attorney disciplinary committee chairman to initiate and then participate in a formal hearing). Attorney disciplinary proceedings, however, were not even mentioned in *Withrow*, nor did the Court cite to any of its own case law concerning attorney disciplinary proceedings in its decision.

¶74.Rather, as the majority here acknowledges, the *Withrow* Court upheld the constitutionality of an *administrative* disciplinary system for Wisconsin physicians, a system entirely regulated by Wisconsin's state legislature. Therefore, *Withrow* does not specifically address the unique "quasi-criminal" process by which states' judicial branches discipline attorneys--a unique classification which the Court itself established prior to the *Withrow* decision. *See In re Ruffalo* (1968), 390 U.S. 544, 551, 88 S.Ct. 1222, 1226, 20 L. Ed.2d 117 (recognizing that such proceedings are neither criminal nor civil, but are "adversary proceedings of a quasi-criminal nature"), *modified on other grounds*, (1968), 392 U.S. 919, 88 S.Ct. 2257, 20 L.Ed.2d 1380. *See also Tweedy v. Oklahoma Bar Ass'n* (Okla. 1981), 624 P.2d 1049, 1053 (acknowledging the *Withrow* holding, and stating that in "contrast to the principles which affect administrative agencies, due process is offended when a judicial institution functions both as an organ of enforcement and adjudication); *Razatos v. Colorado Supreme Court* (10th Cir. 1984), 756 F.2d 1429, 1435 (identifying attorney disciplinary proceedings as "definitely judicial rather than administrative in

nature").

¶75.This Court, like the Oklahoma Supreme Court in *Tweedy* and most other states, possesses original and exclusive jurisdiction in all matters involving the admission of persons to the bar and sole responsibility for disciplining unprofessional and unethical conduct of its members. *See Wyse*, 212 Mont. at 345-46, 688 P.2d at 762 (citing Article VII, Section 2(3) of the Montana Constitution). The legal profession in this country, as noted by Chief Justice Marshall in 1824, has always been one regulated by the judiciary itself. *See Ex parte Burr* (1824), 22 U.S. (9 Wheat.) 529, 530, 6 L.Ed. 152.

¶76.As an arm of this Court, the COP is necessarily bound by all precedents regarding the impartiality of the judiciary in relation to prosecutorial functions. Therefore, "[c]oncentrating the powers of judge and prosecutor in the same person or body poses an unreasonably high risk of compromising the protected and cherished value of judicial detachment and neutrality." *Tweedy*, 624 P.2d at 1053 (citations omitted). Although factually distinguishable from the matter at bar, the underlying principles expressed in *Tweedy* relative to the Oklahoma attorney disciplinary process remain the same: "[v]esting prosecutorial duty in a judge is incompatible with the Constitution's command for an untrammeled exercise of adjudicative function." *Tweedy*, 624 P.2d at 1053 n.8 (citations omitted).

¶77.This critical distinction addressed in *Tweedy* is precisely why *Withrow* should not be applied to attorney disciplinary proceedings. Unfortunately, that has not been the case. According to the rather misleading reasoning of *Withrow*, because judges in criminal matters "issue arrest warrants on the basis that there is probable cause to believe that a crime has been committed and that the person named in the warrant has committed it," and then the same judge presides over the defendant's trial, this combination of "investigative" and "adjudicative" functions does not, "without more," violate due process. *See Withrow*, 421 U.S. at 56-58, 95 S.Ct. at 1469-70 (stating that where the same agency makes the "initial charge or determination of probable cause and the ultimate adjudication" in "tandem" does not result in a procedural due process violation). This same illustration is relied on by the majority here. *See* ¶ 25. That does not make the analogy any less faulty, however.

¶78.A judge determines probable cause and issues an arrest warrant for the plain and simple reason that the Constitution requires that certain functions in the criminal process be kept *separate*, and not combined. Unlike the COP (the "trial tribunal") in Montana's

present disciplinary scheme, a judge does not investigate criminal activities and then file or direct the filing of criminal charges on the basis of the investigation. A judge does not decide who should be arrested. Rather, the prosecutor--a member of the executive branch of government--performs these investigative and charging functions. It is the prosecutor who requests the issuance of an arrest warrant from the neutral and detached magistrate who has determined only that probable cause supports the charge and the issuance of the warrant. While the same judge who made the probable cause determination may ultimately preside over the trial of the criminal case, the judge does not have a vested interest in the outcome by reason of the judge's having investigated the case and having determined that, or what charges should be filed in the first instance. In fact, whether the case comes to trial at all, is plead out, or is dismissed altogether, are basically prosecutorial, not judicial, decisions. *See State ex rel. Fletcher v. District Court* (1993), 260 Mont. 410, 415, 859 P.2d 992, 995. Furthermore, unless the defendant waives his constitutional right to a jury trial, the accused's guilt will not even be decided by the judge.

¶79.Moreover, as the U.S. Supreme Court has often stated, "[t]he prominent place the warrant requirement is given in our decisions reflects the basic constitutional doctrine that individual freedoms will best be preserved through a *separation of powers and division of functions among the different branches and levels of Government*." *Arkansas v. Sanders* (1979), 442 U.S. 753, 759, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235 (emphasis added) (citation omitted). Similarly, we have recognized the same principle in our own jurisprudence in stating that probable cause and the scope of a search must "be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *State ex rel. Townsend v. District Court* (1975), 168 Mont. 357, 363, 543 P.2d 193, 195 (quoting *Johnson v. United States* (1948), 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436).

¶80.Indeed, the illustration used by the Court in *Withrow* does not even mesh with its own jurisprudence. As noted already, eight years prior to *Withrow*, the U.S. Supreme Court explicitly recognized an attorney's basic right to procedural due process in a disciplinary proceeding. *Ruffalo*, 390 U.S. at 550, 88 S.Ct. at 1226. Specifically, the *Ruffalo* Court held that the absence of "fair notice as to the reach of the grievance procedure and the precise nature of the charges" deprived the attorney of his procedural due process. *Ruffalo*, 392 U.S. at 552, 88 S.Ct. at 1226. *See also Cafeteria & Restaurant Workers Union v. McElroy* (1961), 367 U.S. 886, 895, 81 S.Ct. 1743, 1748-49, 6 L.Ed.2d 1230 (stating that "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government

function involved").

¶81.Since *Ruffalo* was decided, the U.S. Supreme Court has not revisited due process violations specifically concerning state attorney disciplinary proceedings. Unfortunately, however, the skewed logic of *Withrow* has made its way into the due process jurisprudence of numerous state courts that have addressed the same issue presented here. *See, e.g., People v. Varallo* (1996), 913 P.2d 1, 4-5 (following *Withrow* and finding no *per se* due process violation in combination of investigative and adjudicative functions in attorney disciplinary proceedings, and citing to similar decisions that relied on *Withrow* from California, Connecticut, Kansas, Michigan, Utah, and Wyoming).

¶82.However, a closer look at many of the states that have adopted *Withrow* reveals that, even in those jurisdictions, the "walls of division"--as suggested here by the *ABA Report*, the respondents and by *amici*--have been implemented to maintain the appearance of impartiality. *See, e.g., Varallo*, 913 P.2d at 4 (noting that "[n]o member of the hearing board or hearing panel can exercise investigative or prosecutorial functions because of the separation between the inquiry panel and hearing panel"). Rather, it remains, that

Montana is the only jurisdiction in the United States that has no professional staff employed in the investigation and prosecution of complaints against attorneys. The Commission on Practice handles a complaint at every stage in the process until final adjudication by the Montana Supreme Court.

*ABA Report, at 9.*

¶83.Additionally, in joining these states, the majority fails to acknowledge those courts which have carefully delineated elements of due process specifically for attorney disciplinary proceedings. *See* Wilburn Brewer, Jr., *Due Process in Lawyer Disciplinary Cases: From the Cradle to the Grave*, 42 S.C.L. Rev. 925 (1991) (identifying seven elements of due process in attorney disciplinary proceedings). *See also In re Robson* (Alaska 1978), 575 P.2d 771 (discussing right to neutral decision-maker and holding that counsel associated with either the prosecution or defense of attorney disciplinary proceeding should not be present during deliberations); *State v. Turner* (Kan. 1975), 538 P.2d 966 (discussing right to public hearing); *People v. Morely* (Colo. 1986), 725 P.2d 510 (identifying right to call and cross-examine witnesses); *In re Meade* (Wash. 1985), 693 P.2d 713 (examining right to counsel); *Kentucky Bar Ass'n v. Shewmaker* (Ky. 1992), 842 S.W.2d 520 (discussing right to pretrial discovery and taking of depositions); *Matter of*

*Jaques* (E.D.Tex. 1997), 972 F.Supp. 1070 (requiring burden of clear and convincing evidence).

¶84.Similarly, in *In re Schlesinger* (Pa. 1961), 172 A.2d 835, the Pennsylvania Supreme Court, relying on the U.S. Supreme Court's decision in *In re Murchison* (1955), 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942, expressly ruled that the combination of the functions of prosecutor, judge and jury in an attorney disciplinary proceeding violated due process. One of the concerns addressed by the Pennsylvania Court was that the Committee on Offenses (like the COP in Montana) appointed counsel to prosecute on its behalf. *Schlesinger*, 172 A.2d at 840. The court stated:

Here, a member of the bar, charged with unprofessional conduct by a bar Committee on Offenses, was prosecuted on the Committee's complaint before a Subcommittee, composed of three members of the Committee, sitting as the trial tribunal. In such a procedure, so contrary to traditional American judicial concepts, unfairness was, ipso facto, inherent; it was fraught with the possibility of temptation to each member of the trial tribunal to favor, consciously or unconsciously, the prosecuting body which appointed him and of which he was a member. The record as a whole contains a reasonable basis for doubt as to whether impartiality on the part of the members of the tribunal was completely absent and suggests an unsympathetic predisposition toward the appellant.

*Schlesinger, 172 A.2d at 841. The Schlesinger court concluded that an actual "predilection to favor one side over the other is not required in order to vitiate a judicial proceeding as being violative of due process." Schlesinger, 172 A.2d at 841. Rather, the respondent need merely show that a "possible temptation" exists. Schlesinger, 172 A.2d at 841.*

¶85.Likewise, once the faulty logic of *Withrow* is discarded, our own case law clearly points to the necessity for separating the investigative, prosecutorial and adjudicative functions in our system of disciplining lawyers. For example, in *State v. Wilson* (1994), 266 Mont. 146, 879 P.2d 683, we concluded that a search warrant issued by a justice of the peace was invalid because he had traveled with a sheriff to recover evidence of the crime and had discussed the evidence and investigation with the sheriff. *Wilson*, 266 Mont. at 149, 879 P.2d at 684-85. We ruled that by becoming a member of the "investigatory team," the justice of the peace could no longer make a neutral and detached evaluation of evidence. *Wilson*, 266 Mont. at 149, 879 P.2d at 684-85. *See also Matter of Sorini* (1986), 220 Mont. 459, 464, 717 P.2d 7, 11 (Sheehy, J., dissenting) (addressing administrative hearing process and stating that the "most elemental notions of due process ought to tell us that objectivity is impossible when one party owns both the prosecutor and

the judge"). *See also, Townsend,* supra.

¶86.While the majority extolls the adequacy of due process provided under Montana's attorney disciplinary scheme, a closer look demonstrates how the failure to separate functions destroys, if not the fact, at least the perception of impartiality. Under our disciplinary rules, the COP may upon its own volition order an investigation into an attorney's misconduct. *Rule 9A.* If not satisfied with the results of this investigation--akin to a finding that no probable cause exists warranting arrest--the COP may nevertheless institute a formal disciplinary proceeding, and then appoint a "special counsel" to file a complaint with the COP. *Rule 9C.* At the direction of the COP, the special counsel, whose role can be likened to that of a prosecutor, sets forth "the charges with sufficient clarity and particularity so as to inform the respondent of the alleged misconduct." *Rule 9C.* Subsequently, the COP's presiding officer--either the chairperson or another member of the COP appointed by the chair--sits as judge at the hearing, with the authority to "rule on all motions, objections, and other matters presented in connection with such hearing." *Rule 9C.*

¶87.That the foregoing combines the functions of adversary-investigator/ prosecutor with neutral and detached judicial/decision-maker is obvious. As the *ABA Report* observed:

Having the same group perform oversight and review functions at each stage in the process as well as conduct hearings and make findings, conclusions, and recommendations to the Supreme Court creates an appearance of unfairness, although no improprieties were found. It is difficult for any person to review complaints initially to determine whether they should be investigated, review them again after investigation to determine whether formal charges should be filed and then sit as an impartial adjudicator.

*ABA Report, at 9.*

¶88.In short, under Montana's lawyer disciplinary rules, the "judge" (COP) has the power to direct the "police" (investigator) to investigate a suspect (the respondent attorney), then tell the "prosecutor" (special counsel) what charges to bring, and then, even against the advice of both the "police" and the "prosecutor," order that the suspect be brought to trial. The "judge" then decides the "guilt" of the accused on the charges it ordered filed.

¶89.Such a scheme simply does not and cannot afford attorneys subject to discipline with the neutral and detached decision-maker that due process requires. Following the

reasoning suggested by the courts in *Tweedy* and in *Schlesinger*, as well as the notion that the judicial decision maker cannot be part of the "investigatory team" as we stated in *Wilson*, it is clear that the disciplinary procedures established under Rule 9 violate the right to due process of law guaranteed to attorneys under Article II, Section 17 of Montana's Constitution.

¶90.Moreover, the fact that we have now chosen to march lockstep with the U.S. Supreme Court and certain of our sister jurisdictions in applying the contrary logic of *Withrow* does not alter the fact that we have utterly failed to provide the respondents here, and all Montana lawyers subject to discipline, with the "most exacting demands of due process of law." *Law Students Civil Rights Research Council, Inc. v. Wadmond* (1971), 401 U.S. 154, 174, 185, 91 S.Ct. 720, 731, 737, 27 L.Ed.2d 749 (Black and Douglas, JJ., dissenting) (stating that members of a state bar "should not be disciplined . . . without full and unquestioned due process of law and protection of all their constitutional rights . . . . before an unquestionably impartial tribunal"). Indeed, for a Court that is defiantly proud of providing more protection to our citizens under Montana's Constitution than they might enjoy under the federal constitution, we have completely abrogated our responsibility to interpret Article II, Section 17 in that fashion, choosing, instead, to rely on the logic of a U. S. Supreme Court case that did not even involve due process in the context of unique, quasi-criminal attorney disciplinary proceedings.

¶91.Montana attorneys subject to discipline are entitled to no less due process than are administrative agency employees, pursuant to §§ 2-4-101 through 711, MCA, and other licensed professionals in Montana pursuant to § 37-1-101 through 413, MCA. I would hold the procedures under Rule 9 which fail to separate the adjudicative function from the investigative and prosecutorial functions of the COP and which, thus, fail to guarantee an impartial tribunal are *per se* violative of the due process clause of Montana's Constitution, Article II, Section 17, and are, therefore, unconstitutional.

## *II. Rule 13*

¶92.Along the same lines, I also disagree with our decision as to Rule 13. The majority concludes that Rule 13's confidentiality requirements, which prevent an accused attorney's access to investigation information made prior to filing a formal complaint, do not violate due process. Specifically, Rule 13A provides:

Confidentiality. All disciplinary proceedings which are prior in time to the filing of a

formal complaint with the Clerk of the Supreme Court and service upon the respondent as provided in Rule 11A of these rules, and all documents in connection therewith shall be confidential.

¶93. The majority summarily concludes at ¶ 42 that "any evidence relating to portions of an informal complaint not included in the formal charges filed against an attorney is not relevant, much less important, to the respondent attorney's preparation to meet the charges at the formal hearing." Yet, the majority then suggests at ¶ 43 that Rule 13 may necessarily be abridged: "any exculpatory evidence which was filed before the formal complaint and which relates to matters eventually included in the formal complaint must be disclosed to the respondent attorney." As written, the Rule simply does not require such a disclosure.

¶94. This obvious contradiction between the actual language of Rule 13 and our apparent recognition of the due-process necessity for disclosure of exculpatory information is "resolved" by our review of the Commission's files and our conclusion that no exculpatory evidence could be found. No doubt our determination in that regard will be of great comfort to Goldstein and Albers (and to future attorneys who may be the beneficiaries of our similarly magnanimous *in camera* review). The point is, the plain language of Rule 13 does not guarantee that exculpatory information contained in pre-formal complaint files will be available to the accused attorney. Due process is offended by that fact, alone. And, it bears repeating that, for the purposes of due process, actual harm need not be shown. *Mayberry*, 400 U.S. at 469, 91 S.Ct. at 507; *Schlesinger*, 172 A.2d at 841.

¶95. Of even greater import, however, is the fact that Article II, Section 9 of Montana's Constitution requires that matters filed with the COP--whether pre-complaint or post complaint be available for inspection by the accused attorney. The guarantees provided to citizens, including attorneys, under the "right to know" provision of Montana's Constitution are as binding upon this Court and its disciplinary arm, the COP, as on any other branch or agency of government. In fact, we stated in *Associated Press v. Board. of Public Educ.* (1991), 246 Mont. 386, 391, 804 P.2d 376, 379, that "[f]irst and foremost, is the realization that the Constitution is the supreme law of this State. *Its mandate must be followed by each of the three branches of government.*" (Emphasis added). It is, thus, appropriate to begin by discussing this mandate.[(3)]

¶96. Article II, Section 9 of the Montana Constitution provides:

**Right to know.** No person shall be deprived of the right to examine documents *or to observe the deliberations of all public bodies* or agencies of state government and its subdivisions, *except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.* (Emphasis added).

My research reveals no Montana case law ruling on the applicability or inapplicability of this constitutional provision to the judicial branch or, more specifically, to the proceedings and deliberations of this Court and, hence to the COP. Therefore, I turn to the rules of constitutional construction.

¶97.In resolving disputes of constitutional construction, this Court applies the rules of statutory construction. Under those rules, the intent of the framers of the Constitution is controlling and that intent must first be determined from the plain meaning of the words used. *Butte-Silver Bow Local Gov't v. State* (1989), 235 Mont. 398, 403, 768 P.2d 327, 330 (citation omitted). Moreover, under these rules, if the language is clear and unambiguous, no further interpretation is required. *Lovell v. State Comp. Mut. Ins. Fund* (1993), 260 Mont. 279, 285, 860 P.2d 95, 99 (citation omitted). The courts may not go further and apply any other means of interpretation, *Tongue River Elec. Coop. v. Montana Power Co.* (1981), 195 Mont. 511, 515, 636 P.2d 862, 864 (citation omitted), nor may a judge insert into a constitutional provision what has been omitted or omit what has been inserted. *See* § 1-2-101, MCA.

¶98.Applying these well-settled rules of constitutional construction, it is clear that the plain language of Article II, Section 9, does not exempt this Court, much less its disciplinary arm, from the provision's mandate. Rather, Montana's constitutional "right to know" unambiguously covers the deliberations of *all public bodies of state government.* That includes this Court and the COP.

¶99.Nonetheless, even ignoring the clarity of Article II, Section 9, and the dictates of our constitutional construction jurisprudence, the proceedings of the 1972 Constitutional Convention also lead to the conclusion that the "right to know" requirements do not apply exclusively to the legislative and executive branches of state government and its subdivisions to the exclusion of the judicial branch.

¶100.In point of fact, the delegates to the Constitutional Convention amended the language of what became Article II, Section 8 of the Montana Constitution, which gives the public the right to participate in the operations of governmental agencies, on Delegate Berg's

motion, so as to exclude the judicial branch. *See* Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, at 1663-67 (1981) (comments of Delegates Berg, Dahood, and McNeil). Notwithstanding that these same delegates discussed the language of what became Article II, Section 9 of the Montana Constitution on the same afternoon that they amended the language of what became Article II, Section 8, they did not even discuss amending the language of what became Article II, Section 9, so as to exclude the judicial branch. *See Verbatim Transcript*, at 1667-1680.

¶101.Delegate Berg, however, subsequently moved to amend the language of what became Article II, Section 9, out of his concern that the phrase "public bodies" could be interpreted to include juries, grand juries, or the deliberations of this Court. *Verbatim Transcript*, at 2499-2501. Delegate Dahood stated that he agreed with Delegate Berg and that the committee was "not trying to upset any traditional rule of procedure with respect to anything within the judiciary." Notwithstanding, Delegate Dahood stated that he would not amend the section as Delegate Berg had suggested. Delegate Berg then stated in his closing statement in support of his motion that "my purpose in asking to delete the word[s] 'bodies or' is to eliminate the potential interpretation that it might include juries, grand juries, [or] Supreme Court deliberations." *Verbatim Transcript*, at 2501. Despite Delegate Berg's concerns, his motion failed. *Verbatim Transcript*, at 2501.

¶102.Thus, even though Delegate Berg expressed the same concern with regard to what became Article II, Section 8, and what became Article II, Section 9, the delegates amended only the language of what became Article II, Section 8, so as to exclude the judicial branch. More to the point, the delegates declined to amend the language of what became Article II, Section 9, so as to exclude the judicial branch even though faced with the same concern that prompted them to amend what became Article II, Section 8.

¶103.Hence, not only the plain language but also the constitutional history of these companion provisions of the Montana Constitution show that Article II, Section 9, is broader than Article II, Section 8. Article II, Section 9, gives the public the right to *observe* the deliberations of *all public bodies* and agencies while Article II, Section 8, gives the public the right to *participate* only in the operations of *agencies*. That, of course, begs the question whether this Court is a "public body." The answer to this question is undeniably "yes."

¶104.In *Common Cause v. Statutory Committee* (1994), 263 Mont. 324, 329, 868 P.2d 604, 607, we noted that the rights, which Article II, Section 9, guarantees, are protected

and implemented primarily through Montana's open meeting statutes, codified at §§ 2-3-201 through 221, MCA. One of these statutes, § 2-3-203(1), MCA, provides:

All meetings of *public or governmental bodies*, boards, bureaus, commissions, agencies of the state, or any political subdivision of the state or organizations or agencies supported in whole or in part by public funds or expending public funds must be open to the public. (Emphasis added).

In *Common Cause*, we recognized that the legislature did not define "public body" or "governmental body" in the open meeting statutes. *Common Cause*, 263 Mont. at 330, 868 P.2d at 608. Thus, we gave the words in these phrases their "plain, ordinary and usual meaning" and stated that "the common understanding of the phrase 'public or governmental body' would include a group of individuals organized for a governmental or public purpose." *Common Cause*, 263 Mont. at 330, 868 P.2d at 608 (citations omitted). There can be no doubt, this Court is a group of individuals organized by and under the Montana Constitution for a governmental purpose--as is the COP, the appointed disciplinary arm of this Court. It follows, then, that this Court and its COP are both public or governmental bodies.

¶105.Similarly, in *Great Falls Tribune Co., Inc. v. Day,* 1998 MT 133, ¶ 16, 289 Mont. 155, ¶ 16, 959 P.2d 508, ¶ 16, this Court, in determining whether the Department of Corrections Committee for Private Prison Screening and Evaluation was a "public body," looked to the Montana Procurement Act, which defines "governmental body" as:

[A] department, commission, council, board, bureau, committee, institution, legislative body, agency, government corporation, or other entity, instrumentality, or official of the executive, legislative, or *judicial branch* of this state, including the board of regents and the Montana university system.

Section 18-4-123(11), MCA (emphasis added). We stated that, since the committee was a committee of the executive branch of government, and a "governmental body" for purposes of procurement, "it necessarily follows that it is an agency of state government to which Article II, Section 9, applies." *Great Falls Tribune*, ¶ 17. This Court is clearly an "entity . . . of the . . . judicial branch of this state," and, therefore, a "governmental body." Section 18-4-123(11), MCA. Thus, it "necessarily follows" that this Court is a "public body" to which Article II, Section 9, applies. *Great Falls Tribune*, ¶ 17. It also "necessarily follows" that the COP, as the disciplinary arm of the judicial branch of

government, is an agency of state government to which Article II, Section 9, applies. *Great Falls Tribune*, ¶ 17

¶106. The same conclusion can be drawn from our decision in *Becky v. Butte-Silver Bow Sch. Dist. 1* (1995), 274 Mont. 131, 906 P.2d 193. In *Becky*, this Court, in determining whether the records of an organization were "documents of public bodies," looked to § 2-6-101(2)(a), MCA, which states that "public writings" are:

[T]he written acts or records of the acts of the sovereign authority, of official bodies and tribunals, and of public officers, legislative, *judicial*, and executive, whether of this state, of the United States, of a sister state, or of a foreign country;

*Becky, 274 Mont. at 137, 906 P.2d at 197 (quoting § 2-6-101(2)(a), MCA) (emphasis added). Section 2-6-101, MCA, also states that there are four classes of public writings and that "judicial records" are one of the classes. Section 2-6-101(3)(b), MCA. Finally, although we recognized that "documents of public bodies" is not defined in the Montana Constitution, we stated that "it must reasonably be held to mean documents generated or maintained by a public body which are somehow related to the function and duties of that body." Becky, 274 Mont. at 138, 906 P.2d at 197.*

¶107. Applying the definition of "public writings" found in § 2-6-101(2)(a), MCA, it is clear that most, if not all, of the documents which this Court generates and maintains are "public writings," and, therefore, are "documents of a public body." Thus, since the documents which this Court generates and maintains are "documents of a public body," it follows (perhaps backwardly) that this Court is a "public body" to which Article II, Section 9, applies. Similarly, documents filed with and generated by the COP as the disciplinary arm of this Court are likewise "documents of a public body."

¶108. As these cases demonstrate, this Court has been particularly vigilant and uncompromising in protecting Montanans' constitutional "right to know" and in rejecting other governmental bodies' attempts to limit or subvert this right. In *Great Falls Tribune*, for example, the committee argued that the public's right to observe its meetings with private companies which had submitted proposals to build a private correctional facility in Montana and to review the papers associated with the companies' proposals was outweighed by the companies' right to privacy in the information that they had submitted. *Great Falls Tribune*, ¶ 8. We held, however, that the Great Falls *Tribune* had a constitutional right under Article II, Section 9, to observe the committee's deliberations and to examine the committee's documents, including proposals that had been submitted to it. *Great Falls Tribune*, ¶ 33. We also stated that the only exception to the public's right to

observe the committee's deliberations and documents concerned information to which the companies had a privacy interest. *Great Falls Tribune*, ¶ 33.

¶109.And, of course in the proceedings at bar, the only persons with privacy rights at issue--Goldstein and Albers--have waived their rights.

¶110.In sum, and based on the foregoing, if there exists some valid argument for exempting the filings (including pre-complaint filings), the deliberations and decision-making processes of the COP from the operation of Article II, Section 9, the rationale is neither apparent in the tenor of our prior jurisprudence nor, more importantly, in the plain language of the constitutional provision itself or in the history of its adoption.

¶111.Therefore, I would hold that Rule 13 is unconstitutional, not only because it fails to protect the due process rights of attorneys subject to discipline before the COP and this Court, but, and more fundamentally, because the Rule violates the right to know provisions of Montana's Constitution, Article II, Section 9.

### *De Novo Review*

¶112.Finally, I am compelled to address the lynchpin of the majority's rationale, the conclusion which runs throughout its opinion--that, because this Court retains *de novo* review of the findings, conclusions and recommendations of the COP, attorneys' right to due process, to impartiality and to even greater protection than that enjoyed by other professionals in disciplinary proceedings is preserved. *See* ¶ 26.

¶113.True. This Court does retain *de novo* review, as the majority points out. The protections provided by this review are illusory, however, and exacerbate, rather than alleviate the prejudice inherent in Montana's disciplinary system.

¶114.First, let us ignore the fact that, according to the unchallenged statement of Goldstein's attorney, in the past 25 years there cannot be found one case in which this Court has rejected or substantially altered the findings of fact of the COP; that in only six cases over the past 25 years did this Court alter the recommendations of the COP; that in four of those cases we imposed a greater punishment than recommended; that in one case, we imposed less punishment than that recommended; and in only one case, *Matter of McKeon* (1982), 201 Mont. 515, 656 P.2d 179, did we actually reject the COP's recommendation and reinstate the attorney to the practice of law. While the COP

contended at oral argument that this track record proved how well the present system worked, it is just as, if not more, likely that this simply proves that, not surprisingly, this Court relies almost exclusively on and accepts without question the findings, conclusions and recommendations of the "fact finder" COP, rather than on any *de novo* examination of the record which we undertake.

¶115.Second, let us assume for purposes of this opinion, that every member of this Court does, in fact, review every page of the record and transcript of every disciplinary proceeding[(4)] before voting on the COP's findings, conclusions and recommendations. That still does not solve the problem that the members of this Court never actually see and judge the demeanor and credibility of the witnesses who testify at the COP hearings or of the respondent attorney subject to the disciplinary proceedings. And, this is no small deficiency.

¶116.In *Bonamarte v. Bonamarte* (1994), 263 Mont. 170, 866 P.2d 1132, grounding our decision in due process considerations, we reversed the trial court, holding that it had abused its discretion in allowing a party/witness in a contested proceeding to testify by telephone over objection. *Bonamarte*, 263 Mont at 178, 866 P.2d at 1137. Among other things we stated that requiring a witness to testify in the presence of the fact finder "assists the trier of fact in evaluating the witness' credibility by allowing his or her demeanor to be observed firsthand." *Bonamarte* 263 Mont. at 174, 866 P.2d at 1134. We then went on to state:

The *integrity of the fact finding process at trial is undermined where* the parties do not have the opportunity to confront each other or the witnesses, where *the finder of fact does not have the opportunity to observe the parties and the witnesses* and where the opposing party cannot effectively cross-examine the other party or the witnesses.

. . . .

Here, it was impossible for the court to make a determination as to the relative credibility of the party-witnesses because it did not have an opportunity to observe the testimony of both Mark and Judith. . . . [I]t is the court's role to determine who is the more credible witness. This can be accomplished most effectively by observing each party's demeanor during testimony.

*Bonamarte, 263 Mont. at 175-76, 866 P.2d at 1135 (emphasis added). We concluded by noting that:*

*"The opportunity to observe a witness is so critical to judicial control and effective cross-examination that its denial is manifestly prejudicial." Bonamarte 263 Mont. at 178, 866 P.2d at 1137 (quoting State ex rel. Juv. Dept. v. Gates (Or. 1987), 740 P.2d 217, 218) (emphasis added).*

¶117. We have subsequently reaffirmed our commitment to the *Bonamarte* rule in other proceedings. *See Taylor v. Taylor* (1995), 272 Mont. 30, 34-35, 899 P.2d 523, 525-26 (contested administrative child support proceeding); *Matter of B.C.* (1997), 283 Mont. 423, 427-28, 942 P.2d 106, 109 (judicial termination of parental rights); *Bean v. Montana Board of Labor Appeals*, 1998 MT 222, ¶ 33, 290 Mont. 496, ¶ 33, 965 P.2d 256, ¶ 33 (contested administrative unemployment compensation proceeding).

¶118. Given our application of the *Bonamarte* rule in both court cases and in administrative proceedings and given our unequivocal determination of the importance to the "integrity of the fact finding process" that the trier of fact actually be able to see and to judge the credibility of witnesses and parties, I am at a loss to understand how this Court can conduct any sort of a meaningful *de novo* review of COP proceedings from a cold review of the record having never actually seen witness or party one.

¶119. Keep in mind that, as the majority goes to great lengths to repeatedly point out, the saving grace for all the infirmities of the present attorney disciplinary scheme is that this Court has "taken upon itself the sole responsibility to adjudicate lawyer ethical violations," ¶ 26, and that "this Court exercises *de novo* review over the findings of the [COP]," ¶ 30, which "makes only recommendations for discipline," ¶ 26. Taking that at face value, one is left to ponder how--in the face of *Bonamarte* and its progeny--this Court can truly exercise its awesome responsibility of *de novo* review of proceedings where members of a profession can, literally, loose their livelihoods, their reputations, the benefit and expense of years of training and education, and their entire careers without our ever even seeing face-to-face the attorney being disciplined and his or her accusers and without being able to judge their credibility.

¶120. I can only conclude that, like our refusal to abide by Article II, Section 9, as to our deliberations, this is just another example of our telling the courts, administrative agencies, litigants and the citizens of Montana, "Do as we say, not as we do."

### *Conclusion*

¶121. I do not agree with any part of our decision. I would hold Rules 9 and 13 unconstitutional for the reasons set forth in this dissent. I would order immediately the

sorts of reforms discussed herein as to Rule 9. I would allow attorney access to all documents and papers filed with the COP. I would order the COP's deliberations opened. And I would order Goldstein's and Albers' cases be reheard under these reformed procedures.

¶122.I dissent from our refusal to do so.

/S/ JAMES C. NELSON

Justice W. William Leaphart, dissenting.

¶123 I join in ¶¶ 52 - 92 of Justice Nelson's dissent wherein he concludes that the procedures under Rule 9 fail to separate the adjudicative function from the investigative and prosecutorial functions of the Commission on Practice and thus fail to assure an impartial tribunal as guaranteed by the due process clause of the Montana Constitution, Article II, Section 17.

¶124 As to Rule 13, I agree with Justice Regnier that, to the extent it has been interpreted by the Commission to deny an accused attorney access to information pertaining to the alleged misconduct, it has been misinterpreted by the Commission.

/S/ W. WILLIAM LEAPHART

Justice Terry N. Trieweiler dissenting.

¶125.I join in Justice Nelson's dissent from the majority opinion.

¶126.I take no particular satisfaction in this position and, in fact, originally voted with the majority to affirm the attorney discipline process, except for Rule 13. However, after careful review of both opinions, I find the dissent the better reasoned approach, and more consistent with Montana's elevated standards for due process and the actual practices for reviewing disciplinary recommendations by this Court.

¶127.I take no satisfaction in concluding that the disciplinary process for attorneys needs reform because I, like Justice Nelson, have for a number of years reviewed the results of the Commission's work and have no criticism of the Commission's efforts at a practical level. In fact, I, like other members of the Court, have consistently voted to enforce the Commission's recommendations.

¶128.Having made that observation, however, I must also note that I for one do not personally review every part of the record in every Commission proceeding. I simply don't have time to do so. And, as pointed out by Justice Nelson, even if I had time to personally review the entire record in every disciplinary proceeding, I wouldn't be in the position the Commission members are in to evaluate the

credibility of witnesses who present conflicting evidence. I must necessarily defer, in most cases, to the eyes and ears of the Commission members. Therefore, I agree with the dissent that this Court's responsibility for independent review, should be no meaningful comfort to those attorneys who suspect the disciplinary process because of its current structure.

¶129.My greatest concern, however, is with how the disciplinary system can continue to function effectively as it is currently constructed. The commitment of time by current Commission members who must necessarily be involved from start to finish in every complaint about attorney conduct is more than should reasonably be asked of people who have full-time professional responsibilities. I assume that with growth in the profession, greater public scrutiny of attorney conduct and increased sophistication about what a client has a right to expect from his or her attorney, the workload for the Commission members will only increase. In that event, I am concerned as was the team from the ABA, that a cross section of attorneys will no longer be able to serve on the Commission. I am concerned that only those attorneys who come from large firms which are willing to subsidize a member's participation, or those attorneys who have nothing else to do, will be able to afford the commitment of time that service will require. I believe that for the Commission to function well and perform fairly, it must include attorneys from diverse professional backgrounds, including large firms, public service, small firms, and solo practitioners. I frankly don't see how that will be possible with much more of a workload than the Commission already has and I'm sure that those people currently serving on the Commission are making substantial professional sacrifices to do so.

¶130.My joinder in Justice Nelson's dissent is not based on my conclusion that any attorney has been treated unfairly by the Commission, including the two attorneys presently before the Court. It is based simply on my conclusion that there is a better process for deciding whether discipline should be imposed which is more consistent with the requirements of due process and which would, in the long-term, function more effectively for all of those involved in that process, including Commission members.

¶131.Rule 13, on the other hand, is patently unfair and unconstitutional. While there may be some privacy justification for maintaining confidentiality of the Commission's files up until a complaint is filed, there is no justification for withholding information from an attorney against whom a complaint has been filed. I concur that to do so, violates not only the attorney's right to due process, but Article II, Section 9 of the Montana Constitution. Furthermore, it is not up to this Court, after the fact, to determine what is or isn't exculpatory. No one will ever know the extent to which the record was undeveloped or defenses not presented because of information on which the Commission relied and about which the attorney under investigation was unaware.

¶132.It is not sufficient that Rule 13 be rewritten. There is no place in the disciplinary process for hide-and-seek.

¶133.For these reasons, I join in the dissent authored by Justice Nelson.

/S/ TERRY N. TRIEWEILER

Justice Jim Regnier concurring.

¶134.I feel compelled to write separately in response to Justice Nelson's thorough and detailed dissent. In fact, I agree with many of his points, but in the end reach the conclusion that our attorney disciplinary process in Montana is not constitutionally infirm, which of course, is the ultimate question we must answer in this proceeding.

¶135.First, I think it is important to state what this case is not about. It is not whether our system in Montana could be improved. The ABA report is a thorough evaluation with many excellent recommendations.

¶136.The precise question presented is whether our attorney disciplinary process, taken as a whole, violates the due process provisions of the constitutions of Montana and the United States. Goldstein and Albers contend, as Justice Nelson energetically states, that the procedure in Montana is systemically unfair. They argue that the combination of the investigatory and adjudicatory functions vested in the same individuals who serve on the Commission renders the entire process, even if only in appearance, unfair to the lawyers who are subjected to the process.

¶137.Justice Nelson's analysis begins with his conclusion that the United States Supreme Court's decision in *Withrow v. Larkin* (1975), 421 U.S. 35, 95 S. Ct. 1456, 43 L. Ed. 2d 712, is not sound authority for determining whether the combination of the investigatory and adjudicatory functions in attorney disciplinary proceedings results in a denial of due process. He refers to the United States Supreme Court's prior decision in *In re Ruffalo* (1968), 390 U.S. 544, 88 S. Ct. 1222, 20 L. Ed. 2d 117, for the proposition that attorney disciplinary proceedings are quasi-criminal in nature and not administrative as characterized in *Withrow* and therefore, a different analysis should apply.

¶138.*Ruffalo,* however, had nothing to do with the question of whether the combination of the investigatory and adjudicatory function in an attorney disciplinary action violated due process. Rather, *Ruffalo* addressed the question of whether there was a violation of due process in a disbarment proceeding where the charges were amended during the proceeding and after the attorney and a key witness had testified at length. The Court noted that an attorney is entitled to know the charges against him before disbarment proceedings commence and he testifies at length. Allowing amendments to the charges after such testimony which cannot be expunged amounts to a trap and a denial of due process. Although the Court noted that the proceedings were quasi-criminal in nature, *Ruffalo* does not suggest that *Withrow* would have no application to attorney disciplinary proceedings. Furthermore, the statutory framework examined in *Withrow* actually allowed the Examining Board "to institute criminal action or action to revoke license . . . ." It seems to me that the proceedings in *Withrow* which could ultimately result in the loss of a medical license, are not materially different than proceedings which result in the loss of the right to practice law.

¶139.The other authority cited by Justice Nelson for his criticism of *Withrow* is *Tweedy v. Oklahoma Bar Association* (Okla. 1981), 624 P.2d 1049. The facts in *Tweedy* also presented a different question

than the one that concerns us. There, a complainant brought proceedings against three attorneys. After two separate investigations, the Professional Responsibility Commission concluded that the charges were unripe for further proceedings. At that juncture, the complainant directly requested the Oklahoma Supreme Court to issue an order compelling the Professional Responsibility Commission to conduct a reinvestigation of the grievance. The Oklahoma Supreme Court concluded that the decision to investigate a complaint was an executive function, which it could not exercise consistent with due process standards and its adjudicatory responsibilities regarding attorney disciplinary proceedings.

¶140.I am confident that this Court would react in a similar fashion if requested to order our Commission on Practice to reinvestigate a complaint against a lawyer, knowing that we would ultimately sit in judgment regarding the lawyer's conduct. *Tweedy* correctly distinguished *Withrow*, recognizing that administrative agencies are checked by both the legislature and the judiciary. In the Montana scheme, however, the Montana Supreme Court serves as a check on the proceedings conducted by the Commission on Practice much the same way that a district court provides a review of an administrative agency's action, but with a more liberal *de novo* review. *Tweedy* was concerned with the Oklahoma Supreme Court actually meddling with its Commission's investigatory role thus eliminating the benefit of a detached review.

¶141.It is for these reasons, I surmise, that many of the states cited by Justice Nelson still recognize *Withrow,* subsequent to the *Ruffalo* and *Tweedy* decisions, as sound authority for the principle that the combination of adjudicatory and investigative functions does not result in a per se denial of due process. In the final analysis, however, simply because the Montana attorney disciplinary procedures are not per se unconstitutional "does not, of course, preclude a court from determining from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high." *Withrow*, 421 U.S. at 58, 95 S. Ct. at 1470, 43 L. Ed. 2d at 730. Viewing the entire process in the cases before us, I conclude that the "risk of unfairness is not intolerably high."

¶142.Regarding Rule 13, I believe it is being misinterpreted by the Commission. A plain reading suggests to me that the confidentiality provision in the rule is meant to protect and not hinder attorneys who appear before the Commission. Rule 13 was intended to protect the attorney accused of an ethical violation; to ensure that information received prior to the filing of a formal complaint regarding an attorney would not become public. It was not intended to deny an attorney accused of an ethical violation access to the information gathered regarding his or her alleged misconduct.

¶143.I believe at the point the formal complaint is filed the attorney is entitled to all information contained in the Commission's files regarding his or her proceeding. I would not, however, send this matter back for further proceedings. A fair review of the nature of the charges against both respondents, the filings made by their counsel, the opportunity to be heard, and the review of this Court of both files, does not justify the unraveling of these entire proceedings.

¶144.Regarding Justice Nelson's Article II, Section 9, right to know argument, I have adequately expressed my views on the matter in my special concurrence contained in this Court's Order appointing

a fifth member to the Montana Districting and Apportionment Commission dated August 3, 1999.

¶145.As with Justice Nelson, I am also impressed by the credentials of the advocates who have appeared before us in this proceeding, many of whom I have admired for years. I also continue to be amazed at the untiring efforts and contributions made by the members of the Commission on Practice. I think everyone involved, including every member of this Court, recognizes that our profession must be no less vigilant at protecting the constitutional rights of our colleagues as other citizens of this state. Although our attorney disciplinary system may beg for change, I cannot say that it does not meet minimal due process standards as defined by the United States Supreme Court and this Court. I believe that both respondents have been provided a fair hearing.

/S/ JIM REGNIER

Justice Karla M. Gray joins in the foregoing concurring opinion of Justice Jim Regnier.

/S/ KARLA M. GRAY

1. *See In the Matter of Scott A. Albers*, No. 98-011, Order Denying Motion to Dismiss, June 12, 1998, (Nelson, J. dissenting).

2. The 1965 disciplinary scheme did, arguably, have some due process "walls of division" that are lacking in the current rules. For example, the rules provided for a district judge to appoint three to five attorneys in each judicial district to be the local grievance committee to investigate complaints referred to the committee by the COP or a judge. The committee could recommend no charges be filed and the COP, if it concurred, would dismiss the complaint. If the grievance committee recommended the filing of charges and if the COP concurred, the COP would prepare and file the charges and the complaint would be signed by an interested person. A hearing examiner or hearing committee then heard the charges which the COP had drafted and a report was made to the COP, which could accept or reject the findings and recommendations. *See* Rules IV, VI and VIII of the 1965 Rules, adopted by this Court, Order No.10910, January 5, 1965.

3. This same rationale was set out in my dissent to our August 3, 1999 Order, *In Re the Selection of a Fifth Member to the Montana Districting and Apportionment Commission*. Since the majority cites to that order at ¶ 48 as authority for its decision on the Rule 13 issue and since our order was, technically, not published as an opinion, I will restate my rationale here.

4. Of course no one except the individual members of this Court will ever know how these cases are actually reviewed, given the majority's decision that Article II, Section 9, does not apply to our deliberations. See our August 3, 1999 Order *In Re the Selection of a Fifth Member to the Montana Districting and Apportionment Commission*, cited at ¶ 48 of the majority opinion.